Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JM ADVISORY GROUP, LLC.<br><br>Apelante<br><br><br>v.<br><br><br>MUNICIPIO DE GUAYAMA, representado por su alcalde, HON. O'BRIAN VÁZQUEZ MOLINA<br><br>Apelado | KLAN202500230 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Guayama<br><br><br>Sobre:  Cobro de Dinero, Incumplimiento de Contrato<br><br><br>Caso Núm. GM2023CV00989 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero, el Juez Campos Pérez y el Juez Sánchez Báez.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de julio de 2025.

Comparece ante nos JM Advisory, LLC ("JM") mediante el presente recurso de apelación y nos solicita que revoquemos la *Sentencia Sumaria* emitida el 17 de enero de 2025, por el Tribunal de Primera Instancia, Sala Superior de Guayama ("TPI").[1] La Sentencia apelada declaró No Ha Lugar una moción de sentencia sumaria presentada por JM en cobro de dinero; y en consecuencia, declaró Con Lugar la moción en oposición y solicitud de sentencia sumaria presentada el Municipio Autónomo de Guayama ("MA-Guayama" o "Municipio").

Considerados los escritos de las partes revocamos la *Sentencia Sumaria* apelada y concedemos la demanda en favor de JM por los siguientes fundamentos.

---

[1] Notificada el 21 de enero de 2025.

**-I-**

El **5 de diciembre de 2023**, JM presentó una demanda en cobro de dinero contra el MA-Guayama por incumplimiento de contrato.[2] JM alegó que el **27 de octubre de 2021**, el Municipio representado por su entonces alcalde, Hon. Eduardo E. Cintrón Suárez, suscribió un *Contrato de Servicios Profesionales* con JM, representado por su Administrador, el Sr. Jorge L. Márquez Pérez ("señor Márquez Pérez").[3] En dicho contrato, las partes pactaron que JM proveería sus servicios para el análisis de cuentas y gestiones de cobro de contribuciones sobre la propiedad mueble e inmueble del MA-Guayama. Las partes acordaron que JM prestaría sus servicios por la cantidad total de $8,400.00 a razón de 120 horas por $70.00 la hora. De igual forma, pactaron que los honorarios relacionados con la gestión de cobro se pagarían de forma contingente a razón de 25% de todos los recaudos obtenidos de las gestiones individuales hasta un máximo de $10,000 y una comisión de 10% de todos los recaudos obtenidos con balances en exceso de $10,000 en armonía con el Código Municipal de Puerto Rico, *infra*. El **24 de mayo de 2022**, el contrato se enmendó para que constara la firma del actual alcalde del MA-Guayama, Hon. O' Brian Vázquez Molina.[4] JM prestó los servicios según se establecieron en el referido contrato y le requirió al Municipio el pago convenido. Para ello realizó varias gestiones extrajudiciales, verbales, escritas e inclusive, un requerimiento legal para cobrar las cuantías pactadas;[5] no obstante, las gestiones de cobro fueron infructuosas. Por ello, JM le solicitó al TPI que condenara al MA-Guayama al pago total de la deuda ascendente a $387,053.75.

**-I-**

---

[2] Apéndice II de la *Apelación*, págs. 19-24.
[3] Apéndice II de la *Apelación*, págs. 25-28.
[4] Apéndice II de la *Apelación*, pág. 29.
[5] Apéndice II de la *Apelación*, págs. 46-48.

El **12 de febrero de 2024**, el MA-Guayama compareció en *Contestación a Demanda*.[6] En resumen, negó las alegaciones en su contra y arguyó que el señor Márquez Pérez sabía que no podía formalizar contrato con el Municipio puesto que el Artículo 4.6 (b) de la Ley de Ética Gubernamental, *infra*, se lo impedía. De igual forma, arguyó que, ante el conflicto de intereses, el aludido *Contrato de Servicios Profesionales* no se configuró ya que la causa era ilícita por lo cual, no procedía la acción por cobro de dinero ni la reclamación de honorarios. Por lo tanto, presentó una *reconvención* en la adujo que el señor Márquez Pérez fue alcalde del Municipio de Maunabo hasta el 31 de diciembre de 2020, y mientras fue alcalde, presidió la Junta de Gobierno del Centro de Recaudaciones de Ingresos Municipales ("Junta de Gobierno del CRIM"). Por lo cual, estaba impedido de contratar con el Municipio; además, de que este conocía de dicho impedimento ya que la Oficina de Ética Gubernamental ("OEG") le había remitido un comunicado notificándole que no podría asociarse o contratar al CRIM o cualquier entidad del Municipio de Maunabo. Así, el Municipio adujo —que antes de descubrir que el representante de JM fue objeto de una consulta— desembolsó la cantidad de $8,400.00 a favor de JM, por lo que dicho pago fue indebido e ilegal de fondos públicos. En consecuencia, solicitó a JM la devolución de la suma de $8,400.00. Finalmente, alegó que la reclamación sobre honorarios de abogados era improcedente.

Tras varios trámites procesales,[7] el **5 de septiembre de 2024** JM presentó una *Moción en Solicitud de Sentencia Sumaria* en la que presentó dieciséis (16) hechos incontrovertidos:[8]

1. El 27 de octubre de 2021, enmendado el 24 de mayo de 2022, el Municipio de Guayama, representado en

---

[6] Apéndice III de la *Apelación*, págs. 52-59.
[7] Entre ellas, la *Contestación a Reconvención* y *Contestación Enmendada a Reconvención* presentada por JM. Apéndice VIII de la *Apelación*, págs. 65-77 y 79-91.
[8] Apéndice VIII de la *Apelación*, págs. 92-121.

el primer contrato (Exhibit IV), por su entonces Alcalde, Honorable Eduardo E Cintrón Suárez, suscribió un *"Contrato de Servicios Profesionales"*, con JM Advisory Group, LLC, representado por su Administrador, Jorge L Márquez Pérez, luego enmendado, firmada tal enmienda por el actual Alcalde, Honorable, O'Brain Vázquez Molina (Exhibit V).

2. Dicho contrato y enmienda fueron debidamente inscritos en el Registro de Contratos de la Oficina del Contralor.

3. Conforme al hecho expositivo "SEGUNDO: del referido contrato, el propósito de la contratación de servicios profesionales fue *"para el análisis de Cuentas y Gestiones de Cobro sobre contribuciones sobre la propiedad mueble e inmueble del Municipio Autónomo de Guayama, según propuesta."*

4. Según el referido contrato clausula I, Sección I, las responsabilidades de los trabajos contratados conllevaban una fase de planificación, evaluación e implementación del proyecto a desarrollarse de manera compartida entre el ejecutivo, el personal del Municipio y JM Advisory Group, LLC. El Municipio haría disponible JM Advisory Group, LLC., los datos e información que estuviera bajo su jurisdicción y que fueren necesario para la realización del proyecto. La información utilizada no sería divulgada a terceras personas y sería utilizada para los propósitos estipulados.

Entre los datos a proveer por el Municipio estarían los siguientes:

- Listado de cuentas por cobrar de contribuciones sobre la propiedad Muebles e Inmueble por año fiscal.
- Cualquiera otra requerida para el desarrollo del proyecto.

5. Conforme al plan de trabajo establecido en el contrato, Clausulas y Condiciones, Sección II, *"se realizaría una evaluación de los posibles deudores por contribuciones sobre la propiedad y/o cualquiera otro concepto solicitado por el Municipio"* lo cual *"permitiría una visión clara de la cartera de cuentas por cobrar y las expectativas de recaudo."*

6. La parte demandada se obligó a pagar a la parte demandante por sus servicios en una forma compuesta, Sección III, Honorarios:

   a. La porción correspondiente a los honorarios por servicios de planificación, evaluación y consultoría se acordó una cantidad fija de $8,400.00, a razón de 120 horas a $70.00, luego que los servicios se hubiesen realizado y durante el periodo comprendido por este contrato, Sección III, Dos.

   b. Los honorarios relacionados con las gestiones de cobro se pagarían de forma contingente a razón de 25% de todos los

recaudos obtenidos de las gestiones individuales, Sección III, Dos.

7. Los honorarios pactados por el cobro de dinero fueron contingentes y es a esa cuantía que va dirigida la reclamación del demandante ya que la parte demandada se obligó, conforme al referido contrato, SECCION III, TRES, a pagar conforme a lo siguiente: *"...ordenar los pagos correspondientes a los servicios prestados con cargos a la partida número 01-03-04-94.11. Servicios Profesionales, ID-FY2022, luego de que los servicios prestados hayan sido certificados."*

8. La parte demandante cumplió con el referido contrato y requirió el pago al Municipio según convenido. Véase facturas Exhibit VI; que están pendientes de pago. La factura que fue pagada no se reclamó como adeudada.

9. Ante la falta de pago, la parte demandante realizó gestiones extrajudiciales reclamando el pago, gestiones verbales y escritas, incluyendo el requerimiento legal de pago (Exhibit VII y Exhibit VIII) y esperó por el pago dando seguimiento; resultando infructuosas las gestiones.

10. El Municipio de Guayama, se benefició económicamente de los servicios prestados conforme al contrato suscrito.

11. El Municipio de Guayama NUNCA presentó queja alguna en cuanto a los servicios prestados ni por la facturación.

12. A la fecha de la radicación de la demanda el Municipio de Guayama, no ha pagado lo adeudado aquí reclamado a la parte demandante.

13. El Municipio de Guayama, adeuda a la parte demandante la suma de $387,053.75; suma que está vencida, es líquida y exigible.

14. La deuda reclamada es por las siguientes facturas (Anejo VI):
    a. Factura 2021 – 01, 12/17/2021, correspondiente a la suma de **$36,640.41**.
    b. Factura 2022-110, 1/12/2022, correspondiente a la suma de **$54,180.44**.
    c. Factura 2022-116, 2/14/2022, correspondiente a la suma de **$153,743.19**.
    d. Factura 2022-120, 3/07/2022, correspondiente a la suma de **$118,207.12**.
    e. Factura 2022-125, 4/07/2022, correspondiente a la suma de **$12,685.19**.
    f. Factura 2022-129, 5/24/2022, correspondiente a la suma de **$11,597.40**.
        i. **Total: $387,053.75**
        Ninguna de estas facturas ha sido objetada por el municipio y corresponde a honorarios contingentes por el cobro de deudas morosas efectuado por la parte demandante y recibido por el Municipio.

15. La falta de pago por los servicios prestados constituye un incumplimiento de contrato por parte del Municipio de Guayama.

16. La factura correspondiente a los honorarios por servicios de planificación, evaluación y consultoría

por la cantidad acordada como un pago fijo de $8,400.00, a razón de 120 horas a $70.00, luego que los servicios se hubiesen realizado (Anejo XIII) y durante el periodo comprendido por el contrato, fueron pagados por el Municipio y no están reclamados en esta demanda.

Para sostener cada una de las determinaciones de hechos no controvertidas, además de la declaración jurada del señor Márquez Pérez,[9] JM anejó junto a la moción los siguientes Exhibits:

I. Certificado de Organización.[10]
II. Certificado de Registro de Comerciante.[11]
III. Certificado de Número Patronal.[12]
IV. Contrato de Servicios Profesionales del 27 de octubre de 2021 entre JM y MA-Guayama Hon. Eduardo E. Cintrón.[13]
V. Enmienda al Contrato de Servicios Profesionales del 24 de mayo de 2022 entre JM y MA-Guayama Hon. O 'Brian Vázquez.[14]
VI. Facturas pendientes de pago por Servicios Profesionales.[15]
VII. Carta de Cobro de Dinero, Contrato de Servicios Profesionales a Hon. O 'Brian Vázquez.[16]
VIII. Cartas y Gestiones de Seguimiento de Cobro de Dinero Extrajudicial.[17]
IX. Correo electrónico del 9 de junio de 2021, de consulta sobre dispensa enviado por el señor Márquez Pérez a la OEG.[18]
X. Correo electrónico del 21 de junio de 2021, enviado por la OEG en recibo de la consulta sobre dispensa **EV-2021-06-026**.[19]
XI. Correo electrónico del 19 de julio de 2021, de la OEG en contestación a consulta sobre dispensa **CE-22-025**.[20]
XII. Contestación a Consulta del Municipio de Guayama **CE-23-077**.[21]

En resumidas cuentas, JM alegó que el MA-Guayama se negó a efectuar el pago reclamado basado en una interpretación errónea de una opinión emitida por la OEG que no está relacionada con el contrato en controversia. Indicó que el **9 de junio de 2021**, el señor

---

[9] Apéndice VIII de la *Apelación*, págs. 122-123.
[10] Apéndice VIII de la *Apelación*, pág. 124.
[11] Apéndice VIII de la *Apelación*, pág. 125.
[12] Apéndice VIII de la *Apelación*, pág. 126.
[13] Apéndice VIII de la *Apelación*, págs. 127-130.
[14] Apéndice VIII de la *Apelación*, pág. 131.
[15] Apéndice VIII de la *Apelación*, págs. 132-147 y 182-183.
[16] Apéndice VIII de la *Apelación*, págs. 148-150.
[17] Apéndice VIII de la *Apelación*, págs. 151-174.
[18] Apéndice VIII de la *Apelación*, págs. 175-176.
[19] Apéndice VIII de la *Apelación*, pág. 177.
[20] Apéndice VIII de la *Apelación*, págs. 178-179.
[21] Apéndice VIII de la *Apelación*, págs. 180-181.

Márquez Pérez le realizó una consulta sobre una dispensa mediante correo electrónico a la OEG en su carácter personal como medida cautelar **antes** de ofrecer servicios a los municipios, dado que fue alcalde del Municipio de Maunabo hasta el 2020 y como alcalde formó parte de la Junta de Alcaldes del CRIM. En lo pertinente a dicha consulta, el señor Márquez Pérez solicitó lo siguiente:

> Saludos, le escribe Jorge L. Márquez Pérez quien fue alcalde de Maunabo hasta el 2020 y también fui parte de la Junta de Alcaldes del CRIM.
> Le escribo para que me oriente con la siguiente información:
> Actualmente yo trabajo de forma independiente y brindo servicios de consultoría a la Asociación de Alcaldes y a la Cámara de Representantes.
> Adicionalmente, **quiero brindarle servicios de cobro de deudas a los municipios (excluyendo a Maunabo).** En este caso **las deudas que queremos ayudar a que los municipios cobren son las que tienen los contribuyentes por concepto de contribución de Propiedad mueble e inmueble**.
> Para este tipo de servicio me quiero asociar con la firma RS Consulting Services, **con quien el municipio de Maunabo tuvo contrato de servicios profesionales bajo mi incumbencia como alcalde**.
> La pregunta es: **¿Necesito solicitar una dispensa para brindar este tipo de servicio a los municipios en unión a la firma RS Consulting Services? De ser en la afirmativa**, necesito que me indique los pasos a seguir y si puedo tener alguna persona de contacto**.
> […].[22]

El **21 de junio de 2021**, la OEG le notificó al señor Márquez Pérez mediante correo electrónico que su consulta fue recibida y codificada como **EV-2021-06-026**.[23] El **19 de julio de 2021**, la OEG contestó mediante carta recodificada **CE-22-025**. En lo pertinente, la OEG le expresó lo siguiente:

> […]
> De otra parte, el artículo 4.6 (b) de la LOOEG le **prohíbe** al **ex servidor público** ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública, **ante la agencia para la cual laboró**, **durante los dos años siguientes a culminar su empleo**. Con esto, se pretende evitar que el ex servidor público utilice sus contactos, influencia y el conocimiento interno de su anterior empleo para beneficiar a un tercero.
> Ahora bien, nos expresó que, mientras fue Alcalde, fue parte de la **Junta de Alcaldes del CRIM** y también indicó que los servicios de cobros que interesa realizar junto a la Firma se relacionan directamente con dicha institución. Luego de considerar la prohibición establecida en el artículo 4.6 (b) de la LOOEG, determinamos que **usted no podrá comparecer ante el CRIM, o ante cualquier entidad del Municipio, a ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública durante los dos años siguientes a la culminación de su incumbencia como Alcalde**.

---

[22] Apéndice VIII de la *Apelación*, págs. 175-176. Énfasis nuestro.
[23] Apéndice VIII de la *Apelación*, pág. 177.

**Le recordamos que siempre tendrá que abstenerse** de ofrecer información o de asesorar en forma alguna a cliente o compañía **sobre los asuntos en los cuales usted intervino mientras se desempeñó como Alcalde y como parte de la Junta de Alcaldes del CRIM y nunca podrá** utilizar información **confidencial** o **privilegiada** adquirida en el ejercicio de sus cargos públicos para enriquecer su patrimonio o el de un tercero. Estas prohibiciones son de carácter permanente.
        [...].[24]

Tras recibir la contestación de la OEG, el señor Márquez Pérez no contrató con el Municipio de Maunabo, no se asoció con RS Consulting Services, Inc., ni contrató para proveer servicios al CRIM. Arguyó que su contratación fue estrictamente para proveerle servicios al Municipio de Guayama y durante la ejecución del contrato <u>no</u> realizó gestión alguna <u>ante</u> el CRIM. Además, indicó que el MA-Guayama conocía de la consulta sobre la dispensa, puesto que JM le proveyó copia de esta y de la respuesta de la OEG. Inclusive, sostuvo que de acuerdo con la Sección 29 del *Contrato de Servicios Profesionales* el Municipio de Guayama **certificó** "*<u>que el presente contrato ha sido revisado por el asesor legal y que el mismo cumple con todas las leyes y reglamentos estatales y federales, y con las ordenanzas, órdenes ejecutivas, normas, cartas circulares, resoluciones y con cualquier otro criterio y disposición que sean de aplicación</u>*".[25]

También, JM señaló que el **20 de julio de 2022** <u>el MA-Guayama realizó una consulta a la OEG referente al contrato de servicios profesionales en controversia.</u> En específico, el Municipio consultó —si a la luz de las disposiciones de la Ley de Ética Gubernamental, *infra*— podía pagarle al señor Márquez Pérez por los servicios prestados. En la consulta **CE-23-077** del **31 de agosto de 2022**,[26] la OEG le reiteró al Municipio que el señor Márquez Pérez no podía asociarse o contratar con *RS Consulting Services* durante el año siguiente al cesar como alcalde, ni comparecer durante dos

---

[24] Apéndice VIII de la *Apelación*, pág. 176.
[25] Apéndice II de la *Apelación*, pág. 28.
[26] Apéndice VIII de la *Apelación*, 180-181.

años siguientes o posteriores al cese de su puesto al CRIM o cualquier entidad del Municipio de Maunabo. En lo pertinente, la consulta **CE-23-077** expresó:

> [...]
> ... Su consulta obedece a que JM le está reclamando al Municipio el pago de unos servicios prestados como parte de la indicada contratación.
> Explica que mediante la mencionada contratación el señor Márquez Pérez, a través de JM, prestó al Municipio servicios de cobro de deudas por concepto de sobre la propiedad mueble e inmueble de los residentes del Ayuntamiento. Añade que por las deudas cobradas este recibía una contingencia que fluctuaba entre el diez y el veinticinco por ciento, dependiendo del alcance de la deuda.
> En la **CE-22-025** expresamos que el señor Márquez Pérez **no podía asociarse o contratar con RS Consulting Services, Inc.** durante el año siguiente a la fecha en la que cesó de funciones como alcalde. **Asimismo**, puntualizamos que **no podía comparecer ante el CRIM o ante cualquier entidad del Municipio de Maunabo a ofrecer información, intervenir, cooperar, asesorar** en forma alguna o **representar**, **directa o indirectamente**, a una persona **privada**, **negocio** o **entidad pública** durante los dos años siguientes a la culminación de su incumbencia como alcalde. [...].[27]

Además, en dicha consulta **CE-23-077** la OEG se declaró sin jurisdicción sobre el asunto consultado. En específico, la OEG expresó lo siguiente:

> En consideración a que los servicios del señor Márquez Pérez pretendía prestar a través de RS Consulting Services, Inc. a los municipios de Puerto Rico son similares a los que prestó al Ayuntamiento mediante el contrato de 27 de octubre de 2021, **nos consulta si a la luz de las disposiciones de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, el Municipio puede pagarle a este por los servicios prestados**.
> Agradecemos su interés en que nuestra Oficina le asesore con respecto al referido asunto. No obstante, **la OEG no tiene jurisdicción sobre el mismo. Le sugerimos consulte con la Oficina del Contralor de Puerto Rico (OCPR). Fíjese, que una de las responsabilidades ministeriales de la OCPR estriba en asegurarse que todos los desembolsos del Gobierno de Puerto Rico, sus agencias, organismos y municipios, se realicen de acuerdo con la ley.**[28]

Por todo lo antes dicho, JM le solicitó al TPI que declarara Ha lugar su solicitud de sentencia sumaria y, consecuentemente, le ordenara al MA-Guayama cumplir con lo pactado en el *Contrato de Servicios Profesionales*.

El **20 de noviembre de 2024**, el MA-Guayama compareció mediante escrito en *Oposición a Solicitud de Sentencia Sumaria de la Parte Demandante y Solicitud de Sentencia Sumaria a favor del*

---

[27] Apéndice VIII de la *Apelación*, 180-181.
[28] Apéndice VIII de la *Apelación*, pág. 181. Énfasis nuestro.

*Municipio de Guayama.*[29] Aceptó los hechos materiales incontrovertidos número **1**, **2**, **3**, **4**, **5**, **6**, **7**, **9**, **12**, y **16** propuestos por JM. En cuanto a los hechos número **8**, **13**, **14** y **15** el Municipio adujo que estaban en controversia como cuestión de derecho por contravenir el Artículo 4.6 (b) de la Ley de Ética Gubernamental, *infra.* Referente a los hechos número **10** y **11** adujo que no eran hechos materiales a la controversia del cobro de dinero, porque por norma jurídica del enriquecimiento injusto no procede contra el ayuntamiento.

No obstante, el MA-Guayama propuso cuatro (4) hechos materiales adicionales incontrovertidos; a saber:

1. La parte demandante, quien está representada por su Administrador, Jorge Luis Márquez Pérez, ex alcalde del Municipio de Maunabo, fue presidente de la Junta de Gobierno del Centro de Recaudación de Ingresos Municipales en el cuatrienio 2012 al 2016. Y fue miembro de la Junta de Gobierno en el cuatrienio del 2018 al 2020. (Exhibit (A) Municipio de Guayama).
2. El mismo día en que la parte demandante firma el contrato con el Municipio de Guayama, por conducto de su Administrador, Jorge Luis Márquez Pérez, se autorizó a *"representar al Municipio ante el CRIM… y podía solicitar y obtener la información necesaria, incluyendo el acceso a información mediante la página digital del CRIM".* (Exhibit (B) del Municipio de Guayama).
3. El Administrador de la parte demandante y único accionista de la parte demandante, fue alcalde del Municipio de Maunabo, al menos, del año 2016 al 2020. (Se solicita se tome conocimiento judicial).
4. Que, en febrero del 2022, a menos de dos (2) años de haber dejado la Alcaldía de Maunabo como alcalde, el Sr. Jorge Luis Márquez Pérez, asesoró, orientó e interactuó en orientaciones del CRIM, agencia para la cual fue miembro de su Junta de Gobierno, en representación del Municipio de Guayama. (Exhibit (C) del Municipio de Guayama).

Además, el Municipio anejó los siguientes Exhibits: **(A)** Contestación a requerimiento de admisiones juramentado por el señor Márquez Pérez;[30] **(B)** Carta del exalcalde, Eduardo E. Cintrón

---

[29] Apéndice XI de la *Apelación*, págs. 184-195.
[30] Apéndice XI de la *Apelación*, págs. 196-197.

Suárez al Director Ejecutivo del CRIM;[31] **(C)** Declaración jurada de la Directora de Finanzas del MA-Guayama, Sra. Lilliam D. Rodríguez López, en la que se anejan mensajes de texto en *WhatsApp* entre esta y el exalcalde, Eduardo E. Cintrón Suárez.[32]

En síntesis, el MA-Guayama arguyó que el señor Márquez Pérez, como administrador y único accionista de JM, cumple con los elementos de la prohibición establecida en el Artículo 4.6 (b) de la Ley de Ética Gubernamental, *infra*. Esto es, que el señor Márquez Pérez fue presidente y miembro de la Junta de Gobierno del CRIM diez (10) meses antes de que firmara el *Contrato de Servicios Profesionales* con el Municipio.[33] Así, alegó que el señor Márquez Pérez era un ex servidor público, según lo define la Ley de Ética Gubernamental, *infra*. Adujo, además, que el señor Márquez Pérez asesoró, orientó e interactuó en orientaciones del CRIM en representación del MA-Guayama. Esto, según se desprende de la carta remitida por el exalcalde Eduardo E. Cintrón Suárez y de los mensajes de texto por *WhatsApp* habidos entre el exalcalde Eduardo E. Cintrón Suárez y la Sra. Lilliam D. Rodríguez López.[34] Ante todo esto, el Municipio le solicitó al TPI que declarara Ha Lugar su solicitud de sentencia sumaria y, consecuentemente, desestimara la demanda incoada en su contra y declarara Ha Lugar a su reconvención.

El **18 de diciembre de 2024**, JM presentó una *Réplica* a *Oposición* presentada por el MA-Guayama.[35] En esencia, JM reiteró sus alegaciones de que **nunca** ha representado al Municipio ante el CRIM, y que tal representación, no forma parte del contrato ni de la propuesta de JM. Anejó como **Exhibit 1** la *Propuesta de Gestiones*

---

[31] Apéndice XI de la *Apelación*, pág. 198.
[32] Apéndice XI de la *Apelación*, págs. 199-202
[33] Apéndice IX de la *Apelación*, págs. 196-197.
[34] Apéndice IX de la *Apelación*, págs. 198-202.
[35] Apéndice X de la *Apelación*, págs. 203-217.

*de Cobro de Deudas la Réplica,*[36] y como **Exhibit 2** el *Contrato de Servicios Profesionales* del 27 de octubre de 2021 con el alcalde de Guayama, Hon. Eduardo E. Cintrón Suárez.[37]

El **17 de enero de 2025**, el TPI dictó *Sentencia Sumaria* en la cual acogió la oposición y solicitud de sentencia sumaria del MA-Guayama, por lo que declaró No Ha Lugar la solicitud de sentencia sumaria presentada por JM.[38] No sin antes esbozar las siguientes determinaciones de hechos incontrovertidas:

1. El Sr. Jorge L. Márquez Pérez fue alcalde del Municipio de Maunabo hasta el 31 de diciembre de 2020.
2. El Sr. Jorge L. Márquez Pérez fue miembro de la Junta de Gobierno del Centro de Recaudación de Ingresos Municipales (CRIM). Del año 2012 al 2016 fue el Presidente de la Junta y del 2018 al 2020 fue miembro de la Junta.
3. Según lo establecido por el art. 7.006 del Código Municipal de Puerto Rico 21 LPRA § 7955 como miembro de la Junta de Gobierno el Sr. Jorge L. Márquez Pérez tenía las siguientes funciones:
   […]
   g. **Aprobar los planes de trabajo para actualizar y mantener al día el catastro general de propiedad inmueble.**
   h. [….]
   i. **Fijar, mediante el voto afirmativo de la mayoría del total de los Alcaldes miembros de la Junta, las tarifas que podrían imponer y cobrar los municipios por el recogido de desperdicios sólidos en áreas residenciales urbanas y rurales.**[39]
   j. **Rendir al Gobernador de Puerto Rico, a la Asamblea Legislativa, a la Legislatura Municipal y al Alcalde de cada municipio, no más tarde del 30 de enero de cada año, un informe anual, acompañado de los informes financieros anuales que someta el Director Ejecutivo del CRIM. Rendir, además, como parte del informe anual a los Alcaldes y Legislaturas Municipales, un informe detallado y minucioso a cada Alcalde, de las contribuciones muebles e inmuebles estimadas, cobradas, por cobrar y ajustadas, que originan el cuadre final de remesas en su municipio. Además, este informe debe contener elementos gerenciales adicionales tales como experiencia de cobro en el municipio versus deuda, nueva imposición contributiva realizada en el año económico**

---

[36] Apéndice X de la *Apelación*, págs. 218-220.
[37] Apéndice X de la *Apelación*, págs. 221-224.
[38] Apéndice I de la *Apelación*, págs. 1-18.
[39] En la nota al calce en original núm. 1 de la Sentencia Sumaria: *"Véase, exhibit A de oposición a sentencia sumaria entrada núm. 31 ítem #2. "*

**versus el total impuesto, número de tasaciones realizadas en el municipio y su impacto económico entre exoneradas y no exoneradas, comparativa de cantidad de negocios rindiendo planilla de contribución sobre la propiedad mueble que incluya un desglose de sus componentes, tales como valoración, exoneración, exención, y otros que se consideren necesarios, y cualquier otro informe que cada entidad mediante aprobación le exija a la Junta. El CRIM también estará obligado a enviar anualmente a todos los Alcaldes, el detalle del cálculo del estimado de ingresos de su municipio.**

k. **Establecer mediante reglamento los requisitos, condiciones y procedimientos para autorizar la declaración de cuentas incobrables, cancelar y liquidar cualquier deuda de contribución sobre la propiedad existente a favor de los municipios, incluyendo recargos, intereses y penalidades. Dicho reglamento deberá regirse, entre otros, por los siguientes criterios:**
**(1) Tiempo de vencimiento de la deuda, que en ningún caso será menor de diez (10) años.**
**(2) Insolvencia e imposibilidad del deudor o su sucesión hereditaria de pagar dicha deuda y posibilidad razonable de cobrarla.**
**(3) Esfuerzo realizado por el deudor para pagar la deuda.**
**(4) Para la declaración de deudas como incobrables donde exista una porción que afecte al Fondo General o al Fondo de Redención Estatal, se deberá contar con el consentimiento del Secretario de Hacienda.**

l. [...]

m. [...]

n. **Los miembros de la Junta vendrán obligados a informar periódicamente a cada entidad de Alcaldes sobre los resultados de las operaciones del CRIM y todas las determinaciones de la Junta, tales como presupuesto aprobado por la Junta, revisiones a los estimados de ingresos, anticipos a municipios, demandas en proceso y cualquier otra situación que afecte al CRIM y/o a cualquier municipio. Cada entidad de Alcaldes vendrá obligada a asignar en la agenda un tiempo para que los miembros de la Junta hagan una presentación de los resultados de operaciones del CRIM.**

4. El 27 de octubre de 2021, enmendado el 24 de mayo de 2022, el Municipio de Guayama, representado en el primer contrato, por su entonces alcalde, Honorable Eduardo E. Cintrón Suárez, suscribió un *"Contrato de Servicios Profesionales"*, con JM Advisory Group, LLC, representado por su Administrador, Jorge L. Márquez

Pérez, luego enmendado, firmada tal enmienda por el actual alcalde, Honorable, O' Brain Vázquez Molina.[40]

5. El referido contrato era para el **análisis de cuentas y gestiones de cobro sobre contribuciones sobre la propiedad mueble e inmueble** del Municipio Autónomo de Guayama, según propuesta.

6. El contrato establecía que los servicios serían remunerados de la siguiente manera: La porción correspondiente a los honorarios por servicios de planificación, evaluación y consultoría se acordó una cantidad fija de $8,400.00, a razón de 120 horas a $70.00, luego que los servicios se hubiesen realizado y durante el periodo comprendido por este contrato, Sección III, Dos. b. Los honorarios relacionados con las gestiones de cobro se pagarían de forma contingente a razón de 25% de todos los recaudos obtenidos de las gestiones individuales, Sección III, Dos.

7. A la fecha en que se firmó el Contrato Núm. 2022-000258, no había transcurrido un (1) año de la culminación de la incumbencia del Sr. Jorge L. Márquez Pérez como alcalde del Municipio de Maunabo.

8. A la fecha en que se firmó el Contrato Núm. 2022-000258, no había transcurrido un (1) año de la culminación de la incumbencia del Sr. Jorge L. Márquez Pérez como miembro de la Junta de Gobierno del CRIM.

9. El Municipio de Guayama pagó a JM Advisory Group, LLC la cantidad de $8,400.00, a razón de 120 horas a $70.00.[41]

10. El 9 de junio de 2021, el Sr. Jorge Márquez realizó una consulta a la Oficina de Ética Gubernamental donde solicitó orientación si se podía asociar con RS Consulting Group para ofrecer servicios de consultoría a la asociación de alcaldes, cámara de representantes y servicios de cobro de deudas por concepto de la propiedad mueble e inmueble.[42]

11. Mediante correo electrónico el día 19 de julio de 2021 en la consulta **EV-2021-06-026** La Lcda. Mey-Lyng Matos respondió que; el art 4.6 c de la Ley Orgánica de la Oficina de Ética Gubernamental prohíbe a un ex servidor público, durante el año siguiente a la fecha de su terminación de su función gubernamental, contratar directa o indirectamente, con una agencia, persona privada, o negocio, sobre el que haya ejercido una acción oficial durante el año anterior a la terminación de su empleo.[43]

12. En dicha comunicación también se le informó al Sr. Jorge Márquez que debido a que este **fue miembro de la Junta de Gobierno del CRIM no podrá comparecer ante el CRIM o ante cualquier entidad del Municipio** a ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una

---

[40] En la nota al calce en original núm. 2 de la Sentencia Sumaria: *"Véase, exhibit 1 entrada núm. y exhibit IV, V Solicitud de Sentencia Sumaria entrada 22."*

[41] En la nota al calce en original núm. 3 de la Sentencia Sumaria: *"Véase, exhibit XIV de la Solicitud de Sentencia Sumaria entrada 22."*

[42] En la nota al calce en original núm. 4 de la Sentencia Sumaria: *"Véase, exhibit IX de Solicitud de Sentencia Sumaria entrada 22."*

[43] En la nota al calce en original núm. 5 de la Sentencia Sumaria: *"Véase, exhibit XI de Solicitud de Sentencia Sumaria entrada 22."*

persona privada, negocio o entidad pública **durante los dos años siguientes a la culminación de su incumbencia como alcalde.** En nota al calce se informa que este periodo vence el 31 de diciembre de 2022.[44]

13. El Sr. Jorge Márquez luego de la consulta no se asoció a RS Consulting Services, Inc. Lo que hizo fue que estableció su propia corporación, JM Advisory Group, LLC; ésta última es la que contrata con el Municipio de Guayama.

14. El 20 de julio de 2022 el Alcalde del municipio de Guayama realizó la consulta **CE-23-077** a la Oficina de Ética Gubernamental, la cual fue contestada el 31 de agosto de 2022. Mediante la misma se informó que el Municipio autónomo de Guayama había otorgado un contrato por servicios profesionales a JM Advisory Group, LLC. Mediante dicha contratación el Sr. Jorge Márquez prestó servicios de cobro de deudas por concepto de contribuciones sobre la propiedad mueble e inmueble de los residentes de Guayama. Mientras el Municipio estaba considerando las facturas presentadas por el Sr. Márquez Pérez, en representación de la corporación, advino en conocimiento de la opinión emitida por la Oficina de Ética Gubernamental mediante la **CE-22-025**, de 19 de julio de 2021.[45]

15. La consulta del municipio de Guayama fue relacionada a si el Municipio podría pagarle por los servicios prestados, a pesar de que los servicios que el Sr. Márquez Pérez pretendía prestar a través de RS Consulting Services Inc. a los municipios de Puerto Rico son similares a los que prestó al ayuntamiento mediante el contrato suscrito el 27 de octubre de 2021.[46]

16. **La Oficina de Ética Gubernamental se declaró sin jurisdicción y le refirió a la oficina del Contralor de Puerto Rico.**[47]

17. El Municipio de Guayama se benefició económicamente de los servicios prestados por JM Advisory Group, LLC.

18. El Municipio de Guayama en ningún momento presentó queja alguna en cuanto a los servicios prestados por JM Advisory Group, LLC.

19. JM Advisory Group, LLC suministró al Municipio de Guayama varias facturas que se detallan adelante por servicios rendidos:[48]

g. Factura 2021 – 01, 12/17/2021, correspondiente a la suma de **$36,640.41**.

h. Factura 2022-110, 1/12/2022, correspondiente a la suma de **$54,180.44**.

i. Factura 2022-116, 2/14/2022, correspondiente a la suma de **$153,743.19**.

j. Factura 2022-120, 3/07/2022, correspondiente a la suma de **$118,207.12**.

---

[44] En la nota al calce en original núm. 6 de la Sentencia Sumaria: *"Véase, exhibit XI de Solicitud de Sentencia Sumaria entrada 22."*

[45] En la nota al calce en original núm. 7 de la Sentencia Sumaria: *"Véase, exhibit XII Sol. De Sentencia Sumaria entrada 22."*

[46] En la nota al calce en original núm. 8 de la Sentencia Sumaria: *"Véase, exhibit XII Sol. De Sentencia Sumaria entrada 22."*

[47] En la nota al calce en original núm. 9 de la Sentencia Sumaria: *"Véase, exhibit XII Sol. De Sentencia Sumaria entrada 22."*

[48] En la nota al calce en original núm. 10 de la Sentencia Sumaria: *"Véase, exhibit VI Sol. De Sentencia Sumaria entrada 22."*

k. Factura 2022-125, 4/07/2022, correspondiente a la suma de **$12,685.19**.

l. Factura 2022-129, 5/24/2022, correspondiente a la suma de **$11,597.40**.

20. Ante la falta de pago, JM Advisory Group, LLC realizó gestiones extrajudiciales solicitando el pago, resultando infructuosas las gestiones.[49]

21. A la fecha de la radicación de la demanda de autos, el Municipio de Guayama no había pagado lo requerido a la parte demandante.

22. El Municipio de Guayama no pagó a JM Advisory Group LLC. la suma de $387,053.75, por las facturas detalladas en el inciso 18 bajo el fundamento que estaba impedido de contratar con el municipio, según su interpretación de las opiniones emitidas por la Oficina de Ética Gubernamental (OEG) a las consultas CE-22-025 y CE-23-077.[50]

Así, el TPI determinó que el señor Márquez Pérez violó la prohibición establecida en el Artículo 4.6 (b) de la Ley de Ética Gubernamental, *infra*. Razonó que JM y el Municipio de Guayama otorgaron el *Contrato de Servicios Profesionales* apenas diez (10) meses después de la salida del señor Márquez Pérez como alcalde del Municipio de Maunabo y miembro de la Junta de Alcaldes del CRIM. Resaltó que en la misiva de la OEG, al señor Márquez Pérez se le informó que debía abstenerse de comparecer ante el CRIM durante los dos (2) años siguientes a la culminación de su incumbencia como alcalde. Además, que las funciones del señor Márquez Pérez como miembro de la Junta del Gobierno claramente le impedían ofrecer sus servicios al Municipio de Guayama, específicamente:

> *Entre las funciones que el Sr. Márquez tenía como miembro de la Junta del Gobierno estaba el rendir informes tanto al Gobierno como **los Alcaldes de cada municipio** sobre todas las actividades, operaciones y logros del CRIM. Además, este debía proveer un informe detallado y minucioso **a cada alcalde**, de las contribuciones muebles e inmuebles estimadas, cobradas, por cobrar y ajustadas, que originan el cuadro final de remesas en su municipio. Asimismo, en sus funciones en la Junta de Gobierno el Sr. Márquez tenía potestad para establecer mediante reglamento los requisitos, condiciones y procedimientos para autorizar **la declaración de cuentas incobrables, cancelar y liquidar cualquier deuda de contribución** sobre la propiedad existente a favor de los municipios, entre otros.[51]*

---

[49] En la nota al calce en original núm. 11 de la Sentencia Sumaria: *"Véase, exhibit VII de Sol. de Sentencia Sumaria entrada 22."*

[50] Apéndice I de la *Apelación*, págs. 3-8. Énfasis en original y suplidas.

[51] Apéndice I de la *Apelación*, pág. 16. Énfasis en original.

El TPI razonó que, contrario a lo alegado por JM, la prohibición no era únicamente con el Municipio de Maunabo, ya que de acuerdo con el inciso (a) del Artículo 4.6 de la Ley de Ética Gubernamental, *infra*, existe una prohibición temporal y de carácter general por un periodo de dos (2) años para todo exservidor público. Por otro lado, notó que el inciso (b) del Artículo 4.6 de la Ley de Ética Gubernamental, *infra*, tiene una prohibición similar a la del Artículo 4.6 (a); solo que concentrada en la agencia para la cual laboró el exservidor público. A base de esto, el TPI determinó que debido a que el señor Márquez Pérez fue miembro de la Junta de Gobierno del CRIM, este tenía prohibido contratar con **cualquier** municipio para realizar gestiones relacionadas con el CRIM. Por ello, concluyó que la violación de JM con la Ley de Ética Gubernamental, *infra*, acarreó la nulidad de la causa del contrato y la convirtió en una causa ilícita. Por todo esto, el contrato suscrito entre JM y el Municipio de Guayama adolecía de nulidad absoluta.

En desacuerdo, JM acudió ante nos mediante el presente recurso de apelación y planteó la comisión de los siguientes errores:

> **PRIMER ERROR:** Erró el Tribunal de Primera Instancia al no considerar que las funciones del ex-miembro de la Junta del CRIM, según esbozadas en el Código Municipal, caen bajo las excepciones del Artículo 1.2 (e) de la Ley de Ética Gubernamental.

> **SEGUNDO ERROR:** Erró el Tribunal de Primera Instancia al declarar nulo el contrato suscrito entre JM Advisory Group, LLC, representado por el ex-alcalde del Municipio de Maunabo y ex-miembro de la Junta de Gobierno del Centro de Recaudación de Ingresos Municipales (CRIM) con el Municipio de Guayama, por violación a la Ley de Ética Gubernamental, Artículo 4.6, 3 LPRA 1185 7e, cuando no están presentes las circunstancias para tal violación.

> **TERCER ERROR:** Erró el Tribunal de Primera Instancia al declarar nulo el referido contrato por violar el Artículo 4.6 (b) de la Ley de Ética Gubernamental por haberse suscrito dentro de la prohibición de dos años del Artículo 4.6 (b), *supra*, sin considerar las circunstancias que tienen que darse para que aplique tal violación.

> **CUARTO ERROR:** Erró el Tribunal de Primera Instancia al determinar que se violó el Artículo 4.6 (b), de la Ley de Ética Gubernamental, al no determinar que para violar tal inciso las acciones tienen que ocurrir ante la agencia para la cual

laboró el ex-servidor público; no habiendo laborado la parte demandante, previamente, para el Municipio de Guayama y que las gestiones de cobro se realizan individualmente y directamente a ciudadanos morosos; distinto a sus funciones como voluntario en la Junta de Gobierno del CRIM.

**QUINTO ERROR:** Erró el Tribunal de Primera Instancia al no distinguir la premisa utilizada por la Oficina de Ética Gubernamental para contestar la consulta realizada por el ex-servidor público que identificó como **contratación directa con el CRIM**, que es distinta a la situación de hechos de este caso **(Contratación directa con el Municipio de Guayama)**; que es entidad distinta y autónoma.

**SEXTO ERROR:** Erró el Tribunal de Primera Instancia al considerar nulo el referido contrato por violación al Artículo 4.6, supra, **cuando la actividad bajo contrato es para realizar gestiones de cobro directamente a los deudores morosos del Municipio de Guayama**, sobre la contribución de propiedad inmueble amparándose en que el contrato fue suscrito dentro del período de prohibición de dos años del Artículo 4.6 (b) de la Ley de Ética Gubernamental; cuando la actividad contratada cae dentro de las facultades del municipio y **cuando el contrato no es con el Centro de Recaudaciones de Ingresos Municipales** (CRIM); máxime cuando JM Advisory Group, ni su presidente, Jorge Luis Márquez Pérez, no ocuparon puestos en el Municipio de Guayama.

**SEPTIMO ERROR:** Erró el Tribunal de Primera Instancia y cometió error manifiesto en derecho y se desvió de claros preceptos de derecho en la sentencia emitida al interpretar la Ley de Ética Gubernamental sin considerar el propósito y la razón de ser de la referida ley que es para evitar un beneficio a tercero y cuando no hay en la contratación intereses opuestos a la función pública que es lo protege la referida ley.

**OCTAVO ERROR:** Erró el Tribunal de Primera Instancia al determinar que las funciones dispuestas en el Artículo 7.006 del Código Municipal eran funciones que tenía el Sr. Jorge Luis Márquez Pérez, cuando tal Artículo y facultades son de la JUNTA DE GOBIERNO y como cuerpo y no de un miembro de la misma en particular; cuya participación es voluntaria y no labora para el CRIM.

**NOVENO ERROR:** Erró el Tribunal al resolver que la parte demandante-apelante debe devolver la suma de $8,400.00 que le pagó la parte demandada-apelada, que corresponde al pago de 120 horas a $70.00 por hora por el servicio prestado por el análisis de todas las cuentas morosas específicamente del Municipio de Guayama; para lo cual nada tiene que ver el CRlM.

**DECIMO ERROR:** Erró el Tribunal al determinar como hecho que en la consulta a la Oficina de Ética Gubernamental que realizó Jorge Luis Márquez Pérez, solicitó orientación para si podía asociase con RS Consulting Services, Inc., para ofrecer servicios de consultoría a la Asociación de Alcaldes, Cámara de Representantes y servicios de cobro de deudas por concepto de propiedad mueble e inmueble (determinación de hecho #10) cuando de una lectura de la carta (Apéndice VIII, páginas 175-176) la consulta según expresada es si podía asociarse con RS Consulting Services, Inc., para proveer servicio de cobro de deudas morosas a los municipios, excluyendo "Maunabo";

cuando con tal servicio de gestiones de cobro no se viola la Ley de Ética Gubernamental.

**DECIMO PRIMER ERROR:** Erró el Tribunal de Primera Instancia al obviar que ante la consulta del Municipio de Guayama CE 23-077, sobre el contrato objeto de este pleito la Oficina de Ética Gubernamental, a la luz de la Ley de Ética Gubernamental, determinó: "LA OFICINA DE ETICA GERBERNAMENTAL SE DECLARO SIN JURISDICCION, según la determinación de **hecho #16**", lo cual ocurre cuando no se encuentra violación a la Ley de Ética bajo su jurisdicción.

**DECIMO SEGUNDO:** Erró el Tribunal al extralimitar lo expresado en la consulta CE 22-025, que determina que, Jorge Luis Márquez Pérez, no podía contratar con el CRIM ni con el Municipio a determinar que no puede contratar con ningún Municipio en Puerto Rico, cuando la jurisdicción primaria en esta materia es de la Oficina de Ética Gubernamental y tal determinación es contraria a la Ley de Ética Gubernamental y además, erró al adjudicar que tampoco puede contratar con otros municipios que no forman parte en este pleito siendo tal determinación contraria a la Ley de Ética Gubernamental y al debido proceso de ley.

**DECIMO TERCERO:** Erró el Tribunal al resolver en la determinación de hechos #6, contrario al contrato suscrito que los honorarios contingentes pactados corresponden a un 25% de lo recaudado cuando surge claramente del contrato de un 10%.

Oportunamente, el Municipio de Guayama compareció mediante *Alegato de la Parte Apelada.* Así, el recurso quedó perfeccionado.

**-II-**

Reseñado el trato procesal y factico del caso, nos ceñiremos al derecho aplicable a la controversia que nos ocupa.

**-A-**

La Regla 36 de Procedimiento Civil,[52] regula el mecanismo procesal de la sentencia sumaria, cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales.[53] Se considera un hecho material esencial *"aquel que puede afectar el resultado de la reclamación de acuerdo*

---

[52] 32 LPRA Ap. V, R. 36.
[53] 32 LPRA Ap. V, R. 36.3 (e); *Bobé v. UBS Financial Services,* 198 DPR 6, 19 – 20 (2017).

*al derecho sustantivo aplicable".[54]* Por lo tanto, procederá dictar una sentencia sumaria:

> [S]i las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia, demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que [,] como cuestión de derecho[,] el tribunal debe dictar sentencia sumaria a favor de la parte promovente.[55]

Es decir, este mecanismo podrá ser utilizado en situaciones en las que la celebración de una vista o del juicio en su fondo resultare innecesaria, debido a que el tribunal tiene ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y solo le resta aplicar el derecho.[56] De manera, que un asunto no debe ser resuelto por la vía sumaria cuando:

> **(1)** existen hechos materiales y esenciales controvertidos; **(2)** hayan alegaciones afirmativas en la demanda que no han sido refutadas; **(3)** surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o **(4)** como cuestión de derecho no procede.[57]

La precitada regla establece los requisitos de forma que debe satisfacer toda solicitud de sentencia sumaria.[58] El inciso (a) de la Regla 36.3 de Procedimiento Civil, dispone que la moción de la parte promovente deberá contener:

> **(1)** una exposición breve de las alegaciones de las partes; **(2)** los asuntos litigiosos o en controversia; **(3)** la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; **(4)** una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; **(5)** las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y **(6)** el remedio que debe ser concedido.[59]

---

[54] *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 167 (2011).
[55] Regla 36.3 (e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (e).
[56] *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 17 – 18 (2015); *Mejías v. Carrasquillo*, 185 DPR 288, 299 (2012).
[57] *S.L.G. Szendrey-Ramos v. Consejo de Titulares, supra*, a la pág. 167. Énfasis nuestro.
[58] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 431 (2013).
[59] 32 LPRA Ap. V, R. 36.3 (a). Énfasis nuestro.

Asimismo, presentada una moción de sentencia sumaria, la parte promovida no deberá cruzarse de brazos ni descansar exclusivamente en meras afirmaciones o en las aseveraciones contenidas en sus alegaciones.[60] Es preciso que la parte promovida formule —con prueba adecuada en derecho— una posición sustentada con contradeclaraciones juradas y contradocumentos que refuten los hechos presentados por el promovente.[61] Por consiguiente, cualquier duda que plantee sobre la existencia de hechos materiales en controversia no será suficiente para derrotar la procedencia de la solicitud.[62] Después de todo, *"[l]a etapa procesal para presentar prueba que controvierta los hechos propuestos por una parte en su Moción de Sentencia Sumaria no es en el juicio, sino al momento de presentar una Oposición a la Moción de Sentencia Sumaria, según lo exige la Regla 36 de Procedimiento Civil".[63]*

Es por ello, que la parte promovida también tiene la obligación de cumplir con las exigencias enunciadas en las cláusulas (1), (2) y (3) del inciso (a) de la Regla 36.3 de Procedimiento Civil.[64] Le corresponde citar con especificidad cada uno de los párrafos, según enumerados en la solicitud de sentencia sumaria, que entiende se encuentran en controversia, al igual aquellos que no.[65] Dicha tarea, deberá ser realizada de forma tan detallada y específica como lo haya hecho la parte promovente y haciendo referencia a la prueba admisible en la cual se sostiene la impugnación, con cita a la página o sección pertinente.[66]

Ahora bien, la inobservancia de las partes con la normativa pautada tiene repercusiones diferentes para cada una. Al respecto, el Tribunal Supremo de P.R., ha señalado que:

---

[60] *Rodríguez Méndez v. Laser Eye*, 195 DPR 769, 785 (2016).
[61] *Ramos Pérez v. Univisión*, 178 DPR 200, 214 – 215 (2010).
[62] *Oriental Bank v. Perapi et al.*, 192 DPR 7, 26 (2014).
[63] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 122 (2015).
[64] Regla 36.3 (b)(1) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (b)(1).
[65] *SLG Zapata-Rivera v. J.F. Montalvo, supra*, a la pág. 432.
[66] *Id.; Burgos López et al. v. Condado Plaza, supra*, a la pág. 17.

> [P]or un lado, si quien promueve la moción incumple con los requisitos de forma, el tribunal no estará obligado a considerar su pedido. A contrario sensu, si la parte opositora no cumple con los requisitos, el tribunal puede dictar sentencia sumaria a favor de la parte promovente, si procede en derecho. Incluso, si la parte opositora se aparta de las directrices consignadas [en la regla] el tribunal podrá no tomar en consideración su intento de impugnación [de los hechos ofrecidos por el promovente].[67]

En ese mismo orden, nuestra jurisprudencia ha establecido que el deber de numeración no constituye un mero formalismo ni es un simple requerimiento mecánico sin sentido.[68] Este esquema le confiere potestad a los tribunales para excluir aquellos hechos propuestos que no hayan sido enumerados adecuadamente o que no hayan sido debidamente correlacionados con la prueba.[69]

Entretanto, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma posición que los foros de primera instancia.[70] Al tratarse de una revisión de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a los foros de primera instancia, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimi*ento* Civil, *supra*.[71] A tenor con lo expuesto, el Tribunal Supremo insular ha pautado lo siguiente:

> [...] el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. [...]
> [Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[72]

---

[67] *Meléndez González et al. v. M. Cuebas*, *supra*, a la pág. 111.
[68] *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*, a la pág. 434.
[69] *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*, a la pág. 433.
[70] *Meléndez González et al. v. M. Cuebas*, *supra*, a la pág. 118; *Vera v. Dr. Bravo*, 161 DPR 308 (2004).
[71] *Meléndez González et al. v. M. Cuebas*, *supra*, a la pág. 118.
[72] *Meléndez González et al. v. M. Cuebas*, *supra*, a las págs.,118-119.

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de prueba que no fue presentada ante el foro de primera instancia ni la adjudicación de hechos materiales en controversia.[73]

**-B-**

En materia de contratos nuestra jurisdicción se reconoce el principio de la autonomía contractual entre las partes contratantes. Al amparo de esta, las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y el orden público.[74] Es harto conocido que las partes contratantes quedan obligadas a las condiciones y los términos pactados cuando concurren los elementos de consentimiento, objeto y causa.[75] Es decir, el consentimiento se refiere a la libre voluntad de las partes para celebrar el contrato.[76] Por lo que el objeto del contrato ha de ser una cosa determinada, mientras que, la causa corresponde a *"la prestación o promesa de una cosa o servicio"*.[77]

Ahora bien, la validez de los contratos con los municipios se determina según las disposiciones aplicables del Código Municipal de Puerto Rico,[78] y no según la teoría de las obligaciones y contratos del Código Civil, que tan solo aplica supletoriamente.[79] Nuestro Tribunal Supremo ha reiterado *"[q]ue las partes que contratan con cualquier entidad gubernamental sin cumplir con los requisitos de contratación gubernamental se arriesgan a asumir la responsabilidad*

---

[73] *Íd.* Énfasis nuestro.

[74] Artículo 54 del Código Civil de Puerto Rico 2020, 31 LPRA sec. 5421.; *SLG Irizarry v. SLG García*, 155 DPR 713 (2001).

[75] *Engineering Service v. AEE*, 209 DPR 1012, 1027 (2022); *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 182 (2018).

[76] Artículo 1237 del Código Civil 2020, supra, 31 LPRA sec. 9771.

[77] *Rosario Rosado v. Pagán Santiago*, 196 DPR 180, 189 (2016). Artículo 269 del Código Civil 2020, supra, 31 LPRA sec. 6131.

[78] Anteriormente, se utilizaba la Ley de Municipios Autónomos que fue derogada mediante la aprobación de la nueva Ley Núm. 107 de 14 de agosto de 2020 conocida como el Código Municipal de Puerto Rico. 21 LPRA sec. 7001 *et seq.*

[79] *Landfill Technologies v. Mun. de Lares*, 187 DPR 794, 801 (2013). Citando a *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530, 537 (2011); *Johnson & Johnson v. Mun. de San Juan*, 172 DPR 840, 854-855 (2007).

*por sus pérdidas"*.[80] Como corolario de lo anterior, el Tribunal Supremo de P.R., ha resuelto que:

> [e]l propósito de los estatutos que regulan la realización de obras y la adquisición de bienes y servicios para el Estado, sus agencias y dependencias, y los municipios, es la protección de los intereses y recursos fiscales del pueblo. De esta forma se evita el favoritismo, el dispendio, la prevaricación y los riesgos del incumplimiento.[81]

Al respecto, el Artículo 1.003 del Código Municipal de Puerto Rico ("Ley Núm. 107-2020") establece como Declaración de Política Pública que su creación tiene el propósito de garantizar a los municipios un mayor grado de autonomía fiscal y gobierno propio para atender eficazmente las necesidades y el bienestar de sus habitantes.[82]

En lo concerniente a los contratos de servicios profesionales y sus honorarios que puede contratar un municipio, el Artículo 1.018 inciso (r) de la Ley Núm. 107-2020 dispone que:

> **Contratar los servicios profesionales, técnicos y consultivos necesarios, convenientes o útiles para la ejecución de sus funciones, deberes, facultades y para la gestión de los asuntos y actividades de competencia o jurisdicción municipal**. Esta facultad incluye la de otorgar contratos contingentes para la investigación, asesoramiento y preparación de documentos en la determinación y cobro de patentes, arbitrios, contribuciones, derechos y otras deudas, siempre que las mismas sean declaradas morosas, incobrables o sean el producto de la identificación de evasores contributivos y de la determinación oficial de la deuda identificada por el Director de Finanzas. Toda comunicación dirigida al deudor deberá estar firmada por el Director de Finanzas, su representante, o su asesor legal. **Los honorarios a pagar en dichos contratos contingentes no sobrepasarán de diez por ciento (10%) del total de la acreencia determinada y cobrada, sin incluir los servicios legales que, por contrato aparte, fuere necesario suscribir y por los que no podrán pagarse honorarios mayores al diez por ciento (10%) de lo determinado y cobrado**. **En ambos casos, tanto en la fase administrativa como en la fase legal, cuando la acreencia por deudor de parte del municipio no exceda los diez (10,000) mil dólares, los honorarios podrán ser hasta un**

---

[80] *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448, 461 (2014). Citando a *Quest Diagnostics v. Mun. San Juan*, 175 DPR 994, 1002 (2009); *Colón Colón v. Mun. De Arecibo*, 170 DPR 718, 728-729 (2007).

[81] *Johnson & Johnson v. Mun. de San Juan, supra,* pág. 854-855.

[82] 21 LPRA sec. 7003.

> **veinticinco por ciento (25%) de lo determinado y cobrado**.
>
> Asimismo, el Alcalde está facultado para formalizar y otorgar contratos de servicios profesionales, técnicos y consultivos, en forma contingente, a través del proceso de solicitud de propuestas o *(Requests for Proposals-RFP)* y lo definido en este Código, en aquellos casos en que el municipio interese llevar a cabo actividades donde el Departamento de Finanzas Municipal no dispone del peritaje, ni del conocimiento y de los recursos técnicos. Disponiéndose, que los honorarios a pagar no excederán del diez por ciento (10%) del total de lo recaudado. Las facultades, deberes y funciones establecidas en este inciso no constituyen una delegación impermisible de la autoridad del Director de Finanzas, ni duplicación de servicios.[83]

En lo concerniente a los contratos que otorga un municipio, el Artículo 2.014 de la Ley Núm. 107-2020 establece que:

> El municipio podrá contratar los servicios profesionales, técnicos y consultivos que sean necesarios para llevar a cabo las actividades, programas y operaciones municipales o para cumplir con cualquier fin público autorizado por este Código o por cualquier otro estatuto aplicable. **No obstante, todo contrato que se ejecute o suscriba en contravención a lo dispuesto en este Artículo será nulo y no tendrá efecto, y los fondos públicos invertidos en su administración o ejecución serán recobrados a nombre del municipio mediante acción incoada a tal propósito.**
> **El municipio no podrá otorgar contrato alguno en el que cualquiera de sus legisladores, funcionarios o empleados tenga, directa o indirectamente, un interés pecuniario.** Disponiéndose que, en el caso de funcionarios o empleados, **salvo los funcionarios electos**, dicha prohibición aplicará en los casos que tengan facultades de suscribir o formalizar contratos a favor del municipio, puedan realizar nombramientos de personal o tengan la capacidad de influir directamente en las decisiones finales de la autoridad nominadora. Como excepción a lo dispuesto en este inciso, la Oficina de Ética Gubernamental podrá autorizar la contratación, de conformidad con lo dispuesto en la Ley 1-2012, según enmendada, conocida como "Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico", y los reglamentos adoptados en virtud de la misma. [...].[84]

A tono con el Artículo 7.004 de la Ley Núm. 107-2020, el Centro de Recaudaciones de Ingresos Municipales ("CRIM") será dirigido por una Junta de Gobierno integrada por once (11) miembros, de los cuales nueve **(9) serán Alcaldes en representación de todos los municipios de Puerto Rico** y los

---

[83] 21 LPRA sec. 7028. Énfasis nuestro.
[84] 21 LPRA sec. 7174. Énfasis nuestro.

restantes dos (2) miembros lo serán el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) o cualquier otro Fiduciario Designado y un funcionario público con experiencia en asuntos municipales que será nombrado por el Gobernador.[85] Además, se requerirá que se obtenga el voto afirmativo de la mayoría de los miembros de la Junta, por lo que de no lograrlo, el asunto, proposición, resolución o propuesta de que se trate, se entenderá derrotado. No obstante, los acuerdos sobre determinaciones contributivas requerirán el consentimiento de dos terceras (2/3) partes de los Alcaldes miembros de la Junta.[86]

El Artículo 7.006 de la Ley Núm. 107-2020 establece, entre otras, que la Junta de Gobierno del CRIM tendrá las siguientes facultades y funciones:

(a) <u>Establecer la política pública, administrativa y operacional del CRIM</u>.
(b) Asegurarse de que el CRIM cumpla en forma efectiva las funciones y responsabilidades que se le delegan en este Capítulo.
(c) Aprobar la organización interna del CRIM, el presupuesto anual de ingresos y gastos, las transferencias entre partidas, el sistema de contabilidad, de personal, de compras y suministros, así como todas las reglas y reglamentos para su funcionamiento, incluyendo todos los aspectos administrativos, operacionales y fiscales.
(d) Nombrar al Director Ejecutivo del CRIM y adoptar un plan de clasificación y retribución para los funcionarios, agentes y empleados necesarios para el adecuado cumplimiento de las disposiciones de este Capítulo.
(e) Nombrar al Secretario de la Junta, quien estará a cargo de administrar la Oficina de la Junta y asesorar a los miembros de la misma. Este puesto estará clasificado dentro del Plan de Clasificación y Retribución como un puesto de confianza, por lo que será de libre selección y remoción por la Junta.
(f) Aprobar contratos de servicios profesionales y técnicos para uso exclusivo de la Junta que permita a los miembros obtener asesoramiento independiente al que pueda proveer el Director Ejecutivo.
(g) <u>Aprobar los planes de trabajo para actualizar y mantener al día el catastro general de propiedad inmueble</u>.
(h) <u>Establecer mediante reglamento los requisitos, condiciones y procedimientos que regirán los convenios o acuerdos de servicios para el recibo del pago de la contribución sobre la propiedad con agencias públicas, instituciones financieras o cooperativas de ahorro y crédito</u>.
(i) <u>Fijar, mediante el voto afirmativo de la mayoría del total de los Alcaldes miembros de la Junta, las tarifas que podrían imponer y cobrar los municipios por el recogido de</u>

---

[85] 21 LPRA sec. 7953.
[86] Artículo 7.005. Junta de Gobierno — Organización Interna. 21 LPRA sec. 7954.

desperdicios sólidos en áreas residenciales urbanas y rurales.

**(j)** Rendir al Gobernador de Puerto Rico, a la Asamblea Legislativa, a la Legislatura Municipal y al Alcalde de cada municipio, no más tarde del 30 de enero de cada año, un informe anual sobre todas las actividades, operaciones y logros del CRIM, acompañado de los informes financieros anuales que someta el Director Ejecutivo del CRIM. Rendir, además, como parte del informe anual a los Alcaldes y Legislaturas Municipales, un informe detallado y minucioso a cada Alcalde, de las contribuciones muebles e inmuebles estimadas, cobradas, por cobrar y ajustadas, que originan el cuadre final de remesas en su municipio. Además, este informe debe contener elementos gerenciales adicionales tales como experiencia de cobro en el municipio versus deuda, nueva imposición contributiva realizada en el año económico versus el total impuesto, número de tasaciones realizadas en el municipio y su impacto económico entre exoneradas y no exoneradas, comparativa de cantidad de negocios rindiendo planilla de contribución sobre la propiedad mueble que incluya un desglose de sus componentes, tales como valoración, exoneración, exención, y otros que se consideren necesarios, y cualquier otro informe que cada entidad mediante aprobación le exija a la Junta. El CRIM también estará obligado a enviar anualmente a todos los Alcaldes, el detalle del cálculo del estimado de ingresos de su municipio. [Nota: Véase Informe Anual 2021]

**(k)** Establecer mediante reglamento los requisitos, condiciones y procedimientos para autorizar la declaración de cuentas incobrables, cancelar y liquidar cualquier deuda de contribución sobre la propiedad existente a favor de los municipios, incluyendo recargos, intereses y penalidades. Dicho reglamento deberá regirse, entre otros, por los siguientes criterios:

    i. Tiempo de vencimiento de la deuda, que en ningún caso será menor de diez (10) años.

    ii. Insolvencia e imposibilidad del deudor o su sucesión hereditaria de pagar dicha deuda y posibilidad razonable de cobrarla.

    iii. Esfuerzo realizado por el deudor para pagar la deuda.

    iv. Para la declaración de deudas como incobrables donde exista una porción que afecte al Fondo General o al Fondo de Redención Estatal, se deberá contar con el consentimiento del Secretario de Hacienda.

**(l)** No obstante, a lo dispuesto en el inciso (k), la Junta autorizará al CRIM, mediante reglamento, las condiciones y procedimientos para formalizar acuerdos finales por escrito, según lo dispone este Artículo.

**(m)** Aprobar la contratación de los servicios de auditoría externa para los informes financieros anuales certificados que deberá incluir, además de los estados financieros auditados del CRIM, el análisis, la auditoría y la certificación de las liquidaciones anuales de las remesas del CRIM a los municipios. Esta contratación requerirá que los auditores externos notifiquen a la Junta cuando los resultados de la auditoría reflejen fallas, irregularidades o desviaciones de las medidas de control fiscal que estén vigentes.

**(n)** Los miembros de la Junta vendrán obligados a informar periódicamente a cada entidad de Alcaldes sobre los resultados de las operaciones del CRIM y todas las determinaciones de la Junta, tales como presupuesto aprobado por la Junta, revisiones a los estimados de ingresos, anticipos a municipios, demandas en proceso y cualquier otra situación que afecte al CRIM y/o a cualquier

municipio. <u>Cada entidad de Alcaldes vendrá obligada a asignar en la agenda un tiempo para que los miembros de la Junta hagan una presentación de los resultados de operaciones del CRIM</u>.[87]

**-C-**

Por último, y como pieza importante del servicio público, se aprobó la Ley Orgánica de Ética Gubernamental, ("Ley Núm. 1-2012").[88] Esta Ley, fue aprobada con el propósito principal de renovar y reafirmar la función preventiva y fiscalizadora de la Oficina de Ética Gubernamental ("OEG").[89]

Entre su misión, el Artículo 2.1 de la Ley Núm. 1-2012 dispone que la OEG *"fiscaliza la conducta de los **servidores públicos** y penaliza a todos aquellos que transgreden la normativa ética que integran los valores en el servicio público"*.[90] Por ello, el Artículo 1.2 (gg) de la Ley Núm. 1-2012 define **servidor público** como aquella *"persona en el Gobierno que interviene en la formulación e implantación de la política pública o no, aunque desempeñe su encomienda permanente o temporalmente, con o sin remuneración"*.[91] Bajo la definición de **servidor público** también están incluidos los contratistas independientes con contratos equivalentes a un puesto o cargo, o que entre sus responsabilidades esté intervenir directamente en la formulación e implantación de la política pública.[92]

Por otra parte, el Artículo 1.2 (q) de la Ley Núm. 1-2012 define **ex servidor público** como *"aquella persona que haya trabajado como servidor público"*.[93] En lo pertinente a nuestro caso, el Artículo 4.6 (a), (b) y (c) de la Ley Núm. 1-2012 establece ciertas **restricciones** para las actuaciones de los **ex servidores públicos**.

---

[87] Artículo 7.006. Junta de Gobierno—Facultades y Funciones. 21 LPRA sec. 7955. Énfasis nuestro.
[88] Ley Núm. 1-2012, según enmendada, conocida como la *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico*, 3 LPRA sec.1854 *et seq.*
[89] Exposición de Motivos, Ley Núm. 1-2012.
[90] 3 LPRA sec. 1855.
[91] 3 LPRA sec. 1854 (gg). Énfasis nuestro.
[92] *Íd.*
[93] 3 LPRA sec. 1854 (q).

El Artículo 4.6 (a) de la Ley Núm. 1-2012, dispone lo siguiente:

> **Un ex servidor público no puede ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar en cualquier capacidad, directa o indirectamente**, a una persona privada, negocio o entidad pública, <u>sobre aquellas **acciones oficiales** o **asuntos** en los que intervino mientras trabajó como servidor público</u>.

Nótese que el citado Artículo 4.6 (a) establece una **prohibición general** al **ex servidor público** en **acciones oficiales** o **asuntos** en los que intervino mientras trabajó como **servidor público**.

Lo antes dicho, cobra forma específica en el Artículo 4.6 (b) de la Ley Núm. 1-2012, al disponer que:

> **Un ex servidor público no puede, durante los dos (2) años siguientes a la fecha de terminación de su empleo gubernamental**, <u>ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública</u>**, ante la agencia para la que laboró**.

El antes citado Artículo 4.6 (b), le impone una prohibición de 2 años al ex servidor de ofrecer información, intervenir, cooperar o asesor, representar directa o indirectamente alguna parte **ante la agencia para la que laboró**.

Por último, el Artículo 4.6 (c) de la Ley Núm. 1-2012, dispone lo siguiente:

> Un **ex servidor público** no puede, durante el año siguiente a la fecha de terminación de su empleo gubernamental, ocupar un cargo, tener interés pecuniario o contratar, directa o indirectamente, con una agencia, persona privada o negocio, sobre el que haya ejercido una **acción oficial** durante el año anterior a la terminación de su empleo. **<u>Se excluye de esta prohibición</u>** los contratos intergubernamentales. **Los gobiernos municipales**, <u>también estarán excluidos del alcance de esta normativa, por lo que podrán contratar, en una jornada parcial de trabajo, a los ex servidores públicos retirados de su municipalidad, condicionado a que hayan cesado sus funciones para acogerse al retiro por edad o años de servicio, sin sujeción a los términos dispuestos en esta ley</u>.
> [...][94]

---

[94] Nótese, que el párrafo a continuación del citado Artículo 4.6 (c) contempla una la siguiente excepción para el ex servidor público que desee regresar al sector privado:

> Esta prohibición no aplica al ex servidor público interesado en regresar al sector no gubernamental, siempre y cuando sus **acciones oficiales** no hubieran favorecido preferentemente a la entidad en la que se propone ocupar un cargo, tener interés pecuniario o contratar. Para que opere esta excepción, la Dirección

Dicho Artículo 4.6 (c) prohíbe al ex servidor público —por plazo de un año— a la finalización del empleo gubernamental, a que ocupe un puesto, u obtenga un interés pecuniario, o contrate directa o indirectamente, con una agencia, persona privada o negocio, sobre el que haya ejercido una **acción oficial**.

No obstante, **quedan excluidos de esta prohibición** cuando se trata de contratos intergubernamentales, contratos con gobiernos municipales y los contratos de ex empleados municipales a tiempo parcial acogidos al retiro por años de servicios.

Cabe resaltar la utilización de los términos **acción oficial** y **asuntos** en las prohibiciones antes mencionadas están definidas en la Ley de Ética Gubernamental.

En específico, la **acción oficial**, que se define en el Artículo 1.2 (a) de la Ley Núm. 1-2012, va dirigida a:

> **gestiones relacionadas con las funciones y deberes asignados al servidor público o en el ámbito de la autoridad delegada a la agencia**, tales como asesorar, investigar, acusar, auditar, adjudicar, **formular reglas y reglamentos sobre partes específicas**. También, incluye todo proceso relacionado con las órdenes, las autorizaciones, las exenciones, las resoluciones, los contratos y la concesión de permisos, franquicias, acreditaciones, privilegios y licencias.[95]

Mientras que en el Artículo 1.2 (e) de la Ley Núm. 1-2012, **asunto** se define específicamente como:

> hecho que involucra a **partes específicas** y en los que el servidor público participa, personal y sustancialmente, o que requiere de su decisión, aprobación, recomendación o investigación. **No incluye la intervención o participación del servidor público en la promulgación de normas o reglamentos de aplicación general o de directrices e instrucciones abstractas que no aludan a situaciones particulares o a casos específicos**.[96]

---

Ejecutiva evaluará la situación con anterioridad a la ocupación del cargo, a la tenencia de un interés pecuniario o al otorgamiento de un contrato.
3 LPRA sec. 1857e. Énfasis nuestro.
[95] 3 LPRA sec. 1854 (a). Énfasis nuestro.
[96] 3 LPRA sec. 1854 (e). Énfasis nuestro.

**-III-**

JM acude ante nos y plantea la comisión de trece (13) errores que se resumen en que el TPI incidió al desestimar su demanda en cobro de dinero contra el Municipio de Guayama por entender que el contrato habido entre las partes era nulo, a tono con lo dispuesto en el Artículo 4.6 de la Ley de Ética Gubernamental, *supra*, sobre restricciones a ex servidores públicos.

Como foro intermedio estamos en la misma posición del TPI para considerar la moción de sentencia sumaria de JM; la oposición y solicitud de sentencia sumaria de MA-Guayama y la réplica a la oposición y solicitud a sumaria de JM. Por lo cual, determinamos *de novo* que ambas partes cumplieron con los requisitos que les impone la citada Regla 36 de Procedimiento Civil.

A tono con lo antes dicho, procedemos a reformular y ordenar las determinaciones de hechos materiales que hizo el TPI en la Sentencia Sumaria apelada, las cuales surgen del expediente que **no hay controversia:**

1. El Sr. Jorge L. Márquez Pérez (señor Márquez Pérez) fue alcalde del Municipio de Maunabo hasta el **31 de diciembre de 2020**. Como alcalde el señor Márquez Pérez fue miembro de la Junta de Gobierno del Centro de Recaudación de Ingresos Municipales (CRIM). Del año 2012 al 2016 fue el Presidente de la Junta del CRIM y del 2018 al 2020 fue miembro de la Junta del CRIM.
2. El **9 de junio de 2021**, en su carácter personal, el señor Márquez Pérez le realizó —vía correo electrónico— una consulta sobre dispensa a la Oficinal de Ética Gubernamental (OEG) **antes** de ofrecer servicios a los municipios,[97] ya que había sido alcalde del Municipio de Maunabo hasta el 2020 y como alcalde formó parte de la Junta de Alcaldes del CRIM.
   La consulta, reza como sigue:
   Saludos, le escribe Jorge L. Márquez Pérez quien fue alcalde de Maunabo hasta el 2020 y también fui parte de la Junta de Alcaldes del CRIM.
   Le escribo para que me oriente con la siguiente información:
   Actualmente yo trabajo de forma independiente y brindo servicios de consultoría a la Asociación de Alcaldes y a la Cámara de Representantes.
   Adicionalmente, **quiero brindarle servicios de cobro de deudas a los municipios (excluyendo a Maunabo).** En este caso **las deudas que queremos ayudar a que los municipios cobren son las que tienen los contribuyentes por concepto de contribución de Propiedad mueble e inmueble**.

---

[97] Apéndice VIII de la *Apelación*, págs. 175-176.

Para este tipo de servicio me quiero asociar con la firma **RS Consulting Services**, **con quien el municipio de Maunabo tuvo contrato de servicios profesionales bajo mi incumbencia como alcalde**.

La pregunta es: **¿Necesito solicitar una dispensa para brindar este tipo de servicio a los municipios en unión a la firma RS Consulting Services? De ser en la afirmativa**, **necesito que me indique los pasos a seguir y si puedo tener alguna persona de contacto**.

De necesitar más información puede comunicarse con este servidor al número 939-640-2169. Espero su respuesta. Muy agradecido.

Jorge L. Márquez Perez.[98]

3. El **19 de julio de 2021**, la OEG le contestó al señor Márquez Pérez mediante carta codificada **CE-22-025**, y en lo pertinente, le indicó:

Estimado señor Márquez Pérez:

**CE-22-025**

El 9 de junio de 2021, la Oficina de Ética Gubernamental de Puerto Rico (OEG) recibió su comunicación de esa misma fecha. Mediante esta, nos consulta si se puede asociar con la firma RS Consulting Services, Inc. (Firma) para brindar a los municipios servicios de cobros de deudas por concepto de contribuciones sobre la propiedad mueble e inmueble. Su consulta obedece a que usted fue el Alcalde del Municipio de Maunabo (Municipio) hasta el 31 de diciembre de 2020, fue parte de la Junta de Alcaldes del Centro de Recaudación de Ingresos Municipales (CRIM) y la Firma tuvo contratos con el Municipio durante su incumbencia.

El **1 de julio de 2020**, el Municipio otorgó un contrato con la Firma para que esta ofreciera servicios de cobro, con vigencia hasta el 31 de diciembre de 2020. El contrato fue firmado por usted. El artículo 4.6 (c) de la LOOEG prohíbe al ex servidor público, durante el año siguiente a la fecha de terminación de su función gubernamental, ocupar un cargo, tener interés pecuniario o contratar, directa o indirectamente, con una agencia, persona privada o negocio, sobre el que haya ejercido una acción oficial durante el año anterior a la terminación de su empleo. La LOOEG define "acción oficial" como las gestiones relacionadas con las funciones y deberes asignados al servidor público o en el ámbito de la autoridad delegada a la agencia, tales como asesorar, investigar, acusar, auditar, adjudicar, formular reglas y reglamentos sobre partes específicas. También, incluye todo proceso relacionado con las órdenes, las autorizaciones, las exenciones, las resoluciones, los contratos y la concesión de permisos, franquicias, acreditaciones, privilegios licencias. La prohibición del artículo 4.6 (c) de la LCOEG no aplica al ex servidor público interesado en regresar al sector no gubernamental, siempre y cuando sus acciones oficiales no hubieran favorecido preferentemente a la entidad con la que se propone contratar. Para que opere esta excepción, la Dirección Ejecutiva evaluará la situación con anterioridad al otorgamiento del contrato.

De conformidad con las disposiciones legales antes mencionadas, las facultades, deberes y que usted ejercía como Alcalde del Municipio **son consideradas acciones oficiales** respecto a la Firma, por lo que es de aplicación la prohibición que dispone el artículo 4.6 (c) de la LOOEG. Por lo antes expuesto, usted **no podrá asociarse o contratar con la Firma** durante el año siguiente a la fecha en que usted cesó funciones como Alcalde.

---

[98] Apéndice del recurso, págs. 175-176. Énfasis nuestro.

De otra parte, el artículo 4.6 (b) de la LOOEG le **prohíbe** al **ex servidor público** ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública, **ante la agencia para la cual laboró**, **durante los dos años siguientes a culminar su empleo**. Con esto, se pretende evitar que el ex servidor público utilice sus contactos, influencia y el conocimiento interno de su anterior empleo para beneficiar a un tercero.

Ahora bien, nos expresó que, mientras fue Alcalde, fue parte de la **Junta de Alcaldes del CRIM** y también indicó que los servicios de cobros que interesa realizar junto a la Firma se relacionan directamente con dicha institución. Luego de considerar la prohibición establecida en el artículo 4.6 (b) de la LOOEG, determinamos que **usted no podrá comparecer ante el CRIM, o ante cualquier entidad del Municipio, a ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública durante los dos años siguientes a la culminación de su incumbencia como Alcalde**.

**Le recordamos que siempre tendrá que abstenerse** de ofrecer información o de asesorar en forma alguna a cliente o compañía **sobre los asuntos en los cuales usted intervino** mientras **se desempeñó como Alcalde y como parte de la Junta de Alcaldes del CRIM y nunca podrá** utilizar información **confidencial** o **privilegiada** adquirida en el ejercicio de sus cargos públicos para enriquecer su patrimonio o el de un tercero. Estas prohibiciones son de carácter permanente.

Esta comunicación está basada estrictamente en los hechos sometidos ante nuestra consideración, razón por la cual no se extiende a hechos o elementos que no fueron informados. De surgir cualquier duda al respecto, puede comunicarse con la Lcda. Mei-Lyng A. Matos Montes a las extensiones 2502 o 2503, o a su correo electrónico, mematos@oeg.pr.gov.

Cordialmente,
Aniano Rivera Torres
Subdirector Ejecutivo.[99]

4. El señor Márquez luego de la consulta no se asoció a RS Consulting Services, Inc., ni contrató con el Municipio de Maunabo. Lo que hizo fue que estableció su propia corporación, JM Advisory Group, LLC; ésta última, es la que prospectivamente contrata con el Municipio de Guayama.

5. El **27 de octubre de 2021**, el Municipio de Guayama, representado por su entonces alcalde, Hon. Eduardo E. Cintrón Suárez, suscribió un *"Contrato de Servicios Profesionales"*, con JM Advisory Group, LLC, representado por su Administrador, Jorge L. Márquez Pérez; luego, el **24 de mayo de 2022** fue enmendado y firmado por el actual alcalde, Hon. O' Brain Vázquez Molina y JM Advisory Group, LLC.[100]

6. Dicho contrato y enmienda fueron debidamente inscritos en el Registro de Contratos de la Oficina del Contralor.

7. Conforme al hecho expositivo SEGUNDO: del referido contrato, **el propósito de la contratación de servicios**

---

[99] En nota al calce de esa carta se informa que el periodo de veda vence el 31 de diciembre de 2022. Apéndice VIII de la *Apelación*, págs. 178-179. Énfasis nuestro.
[100] En la nota al calce en original núm. 2 de la Sentencia Sumaria: *"Véase, exhibit 1 entrada núm. y exhibit IV, V Solicitud de Sentencia Sumaria entrada 22."*

**profesionales fue** *"para el análisis de Cuentas y Gestiones de Cobro sobre contribuciones sobre la propiedad mueble e inmueble del Municipio Autónomo de Guayama, según propuesta."*

8. Según el referido contrato clausula I, Sección I, las responsabilidades de los trabajos contratados conllevaban una fase de planificación, evaluación e implementación del proyecto a desarrollarse de manera compartida entre el ejecutivo, el personal del Municipio y JM Advisory Group, LLC. **El Municipio haría disponible JM Advisory Group, LLC., los datos e información que estuviera bajo su jurisdicción y que fueren necesario para la realización del proyecto**. La información utilizada no sería divulgada a terceras personas y sería utilizada para los propósitos estipulados.

9. Entre los datos a proveer por el Municipio estarían los siguientes:
    - Listado de cuentas por cobrar de contribuciones sobre la propiedad Muebles e Inmueble por año fiscal.
    - Cualquiera otra requerida para el desarrollo del proyecto.

10. Conforme al plan de trabajo establecido en el contrato, Clausulas y Condiciones, Sección II, *"se realizaría una evaluación de los posibles deudores por contribuciones sobre la propiedad y/o cualquiera otro concepto **solicitado por el Municipio"*** lo cual *"permitiría una visión clara de la cartera de cuentas por cobrar y las expectativas de recaudo."*

11. El Municipio de Guayama se obligó a pagar a JM Advisory Group, LLC por sus servicios en una forma compuesta, Sección III, Honorarios:
    a. La porción correspondiente a los honorarios por servicios de planificación, evaluación y consultoría se acordó una cantidad fija de $8,400.00, a razón de 120 horas a $70.00, luego que los servicios se hubiesen realizado y durante el periodo comprendido por este contrato, Sección III, Dos.
    b. Los honorarios relacionados con las gestiones de cobro se pagarían de forma contingente a razón de 25% de todos los recaudos obtenidos de las gestiones individuales, Sección III, Dos.

12. Los honorarios pactados por el cobro fueron contingentes y es a esa cuantía que va dirigida la reclamación del demandante ya que la parte demandada se obligó, conforme al referido contrato, SECCION III, TRES, a pagar conforme a lo siguiente:*"...ordenar los pagos correspondientes a los servicios prestados con cargos a la partida número 01-03-04-94.11. Servicios Profesionales, ID-FY2022, luego de que los servicios prestados hayan sido certificados."*

13. JM Advisory Group, LLC le reclamó al Municipio de Guayama por las facturas de servicios brindados en las siguientes fechas:
    a. Factura 2021 – 01, 12/17/2021, correspondiente a la suma de **$36,640.41**.
    b. Factura 2022-110, 1/12/2022, correspondiente a la suma de **$54,180.44**.
    c. Factura 2022-116, 2/14/2022, correspondiente a la suma de **$153,743.19**.

    d. Factura 2022-120, 3/07/2022, correspondiente a la suma de **$118,207.12**.

    e. Factura 2022-125, 4/07/2022, correspondiente a la suma de **$12,685.19**.

    f. Factura 2022-129, 5/24/2022, correspondiente a la suma de **$11,597.40**.

    Total: **$387,053.75**

14. El Municipio de Guayama en ningún momento presentó queja alguna en cuanto a los servicios prestados por JM Advisory Group, LLC.

15. El Municipio de Guayama se benefició económicamente de los servicios prestados por JM Advisory Group, LLC.

16. El **20 de julio de 2022** el Municipio de Guayama solicitó una consulta a la OEG referente a —si a la luz de las disposiciones de la Ley de Ética Gubernamental, *infra*— podía pagarle JM Advisory Group, LLC por los servicios prestados.

17. El **31 de agosto de 2022**, en la consulta **CE-23-077**,[101] la OEG en lo pertinente, le expresó al Municipio de Guayama:

> Estimado Alcalde:
>
> **CE-23-077**
>
> El **29 de julio de 2022**, la Oficina de Ética Gubernamental de Puerto Rico recibió su comunicación con fecha de 20 de julio de 2022. En síntesis, nos informa que el 27 de octubre de 2021, el Municipio Autónomo de Guayama (Municipio) otorgó un contrato por servicios profesionales a JM Advisory Group, LLC (JM). Al contrato compareció en representación del Municipio el Sr. Eduardo E. Cintrón Suárez, su exalcalde, y el Sr. Jorge L. Márquez Pérez, administrador de JM. El señor Márquez Pérez fue alcalde del Municipio de Maunabo hasta el 31 de diciembre de 2020, y, en tal capacidad era miembro de la Junta de Alcaldes del Centro de Recaudaciones de Ingresos Municipales (CRIM). Su consulta obedece a que JM le está reclamando al Municipio el pago de unos servicios prestados como parte de la indicada contratación.
>
> Explica que mediante la mencionada contratación el señor Márquez Pérez, a través de JM, prestó al Municipio servicios de cobro de deudas por concepto de sobre la propiedad mueble e inmueble de los residentes del Ayuntamiento. Añade que por las deudas cobradas este recibía una contingencia que fluctuaba entre el diez y el veinticinco por ciento, dependiendo del alcance de la deuda.
>
> Expone que mientras que el Municipio estaba considerando las facturas presentadas por el señor Márquez Pérez, en representación de la corporación, advino en conocimiento de la opinión emitida por nuestra Oficina mediante la CE-22-025, de 19 de julio de 2021.
>
> 1. Inicialmente su consulta fue codificada EV-2023-07-049.
>
> Dicha opinión surge como consecuencia de una comunicación que nos remitiera el señor Márquez Pérez en la que nos consultó si se podía asociar con la firma RS Consulting Services, Inc., para prestar a los municipios servicios de cobro de deudas por concepto de contribuciones de la propiedad mueble e inmueble.
>
> En la **CE-22-025** expresamos que el señor Márquez Pérez **no podía asociarse o contratar con RS Consulting Services, Inc.** durante el año siguiente a la fecha en la que cesó de funciones como alcalde. **Asimismo**, puntualizamos que **no podía comparecer ante el CRIM o ante cualquier entidad del Municipio de Maunabo a ofrecer información,**

---

[101] Apéndice VIII de la *Apelación*, 180-181.

> **intervenir, cooperar, asesorar** en forma alguna o **representar**, **directa o indirectamente**, a una persona **privada**, **negocio** o **entidad pública** durante los dos años siguientes a la culminación de su incumbencia como alcalde.
>
> En consideración a que los servicios del señor Márquez Pérez pretendía prestar a través de RS Consulting Services, Inc. a los municipios de Puerto Rico son similares a los que prestó al Ayuntamiento mediante el contrato de 27 de octubre de 2021, **nos consulta si a la luz de las disposiciones de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, el Municipio puede pagarle a este por los servicios prestados**.
>
> Agradecemos su interés en que nuestra Oficina le asesore con respecto al referido asunto. No obstante, **la OEG no tiene jurisdicción sobre el mismo.** Le sugerimos **consulte con la Oficina del Contralor de Puerto Rico (OCPR)**. Fíjese, que una de las responsabilidades ministeriales de la OCPR estriba en asegurarse que todos los desembolsos del Gobierno de Puerto Rico, sus agencias, organismos y municipios, se realicen de acuerdo con la ley.
>
> Esta comunicación está basada en los hechos particulares sometidos ante nuestra consideración y no se extiende a hechos o elementos que no fueron informados. De surgir cualquier duda al respecto, puede comunicarse con la Lcda. Sara B. González Clemente a las extensiones 2502 o 2503, o al correo electrónico sgonzalez@oeg.pr.gov.
>
> Cordialmente,
> Luis A. Pérez Vargas.[102]

18. La Oficina de Ética Gubernamental se declaró sin jurisdicción y le refirió a la oficina del Contralor de Puerto Rico.[103]

19. Ante la falta de pago, JM Advisory Group, LLC realizó gestiones extrajudiciales solicitando el pago, resultando infructuosas las gestiones.[104]

20. A la fecha de la radicación de la demanda de autos, el Municipio de Guayama no había pagado lo requerido por JM Advisory Group, LLC.

21. El Municipio de Guayama no ha pagado a JM Advisory Group LLC. la suma de **$387,053.75**, por las facturas detalladas en el inciso 13 bajo la alegación de que está impedido de contratar con el municipio, según su interpretación de las opiniones emitidas por la Oficina de Ética Gubernamental (OEG) a las consultas **CE-22-025** y **CE-23-077**.[105]

A tono con las veintiún (21) determinaciones de hechos materiales antes dichas, nos toca resolver la controversia de derecho. Esta consiste en que —conforme se dispone en el Artículo 4.6 de la citada Ley de Ética Gubernamental—, el señor Márquez Pérez podía contratar válidamente con el MA-Guayama servicios

---

[102] Apéndice VIII de la *Apelación*, págs. 180-181. Énfasis nuestro.

[103] En la nota al calce en original núm. 9 de la Sentencia Sumaria: *"Véase, exhibit XII Sol. De Sentencia Sumaria entrada 22."*

[104] En la nota al calce en original núm. 11 de la Sentencia Sumaria: *"Véase, exhibit VII de Sol. de Sentencia Sumaria entrada 22."*

[105] Apéndice I de la *Apelación,* págs. 3-8. Énfasis en original y suplidas.

profesionales para cobrar el impuesto municipal sobre bienes muebles y bienes inmuebles en dicho municipio. Entendemos que sí. Veamos.

**Primero**, analicemos las prohibiciones que le hizo la OEG al señor Márquez Pérez, conforme a las determinaciones de hechos incontrovertidas número **1**, **2**, **3** y **4** antes indicadas. De entrada, el señor Márquez Pérez fue alcalde del Municipio de Maunabo hasta el **31 de diciembre de 2020**, y hasta ese término fue miembro de la Junta de Gobierno del CRIM en la que —del año 2012 al 2016— fungió como Presidente de la Junta y —del 2018 al 2020— fue miembro de la Junta del CRIM. Por lo que el **9 de junio de 2021**, solicitó una consulta sobre dispensa a la OEG para brindarle servicios de cobro de deudas a los municipios (excluyendo a Maunabo), por concepto de contribución de propiedad mueble e inmueble, ello, asociado con la firma RS Consulting Services, con quien el municipio de Maunabo tuvo contrato de servicios profesionales bajo su incumbencia como alcalde. En específico, la pregunta fue: *¿Necesito solicitar una dispensa para brindar este tipo de servicio a los municipios en unión a la firma RS Consulting Services?*

La respuesta de la OEG llegó **19 de julio de 2021**, mediante carta codificada **CE-22-025**. En lo pertinente, se le indicó:

> [...]
> De conformidad con las disposiciones legales antes mencionadas, las facultades, deberes y que usted ejercía como **Alcalde** del Municipio son consideradas **acciones oficiales** respecto a la Firma, por lo que es de aplicación la prohibición que dispone el artículo 4.6 (c) de la LOOEG. Por lo antes expuesto, **usted no podrá asociarse o contratar con la Firma** durante el año siguiente a la fecha en que usted cesó funciones como Alcalde.
> De otra parte, el artículo 4.6 (b) de la LOOEG le **prohíbe** al **ex servidor público** ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública, **ante la agencia para la cual laboró**, **durante los dos años siguientes a culminar su empleo**. Con esto, se pretende evitar que el ex servidor público utilice sus contactos, influencia y el conocimiento interno de su anterior empleo para beneficiar a un tercero.
> Ahora bien, nos expresó que, mientras fue Alcalde, fue parte de la **Junta de Alcaldes del CRIM** y también indicó que los servicios de cobros que interesa realizar junto a la Firma se

> relacionan directamente con dicha institución. Luego de considerar la prohibición establecida en el artículo 4.6 (b) de la LOOEG, determinamos que **usted no podrá comparecer ante el CRIM, o ante cualquier entidad del Municipio, a ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública durante los dos años siguientes a la culminación de su incumbencia como Alcalde**.
>
> **Le recordamos que siempre tendrá que abstenerse** de ofrecer información o de asesorar en forma alguna a cliente o compañía **sobre los asuntos en los cuales usted intervino mientras se desempeñó como Alcalde y como parte de la Junta de Alcaldes del CRIM y nunca podrá** utilizar información **confidencial** o **privilegiada** adquirida en el ejercicio de sus cargos públicos para enriquecer su patrimonio o el de un tercero. Estas prohibiciones son de carácter permanente.
>
> [...].[106]

Nótese que la prohibición de la consulta **CE-22-025** se dirige a tres puntos: **(1)** no asociarse con RS Consulting Services, Inc., **(2)** no ofrecer servicios al Municipio de Maunabo y **(3)** abstenerse de ofrecer información o asesorar a entidad alguna sobre los asuntos en los cuales el señor Márquez Pérez intervino mientras se desempeñó como **Alcalde** y como parte de la **Junta** de Alcaldes del CRIM. Claro que ello incluye utilizar información **confidencial** o **privilegiada** adquirida en el ejercicio de dichos cargos públicos.

Luego de esa consulta **CE-22-025**, el señor Márquez Pérez no se asoció a RS Consulting Services, Inc., ni contrató con el Municipio de Maunabo. Estableció su propia corporación, JM Advisory Group, LLC; la cual, prospectivamente contrató con el Municipio de Guayama.

**Segundo**, abordemos lo concerniente al contrato firmado entre las partes. Surge de las antes dichas determinaciones de hechos materiales número **5**, **6** y **7** que no hay controversia de que el **27 de octubre de 2021** el Municipio de Guayama con el entonces alcalde, Hon. Eduardo E. Cintrón Suárez y JM representado por su Administrador señor Márquez Pérez, suscribieron el *Contrato de*

---

[106] En nota al calce de esa carta se informa que el periodo de veda vence el 31 de diciembre de 2022. Apéndice VIII de la *Apelación,* págs. 178-179. Énfasis nuestro.

*Servicios Profesionales*, que, el **24 de mayo de 2022** fue enmendado y firmado por el actual alcalde, Hon. O' Brain Vázquez Molina y JM representado por el señor Márquez Pérez. Tampoco hay controversia de que dicho contrato y enmienda fueron debidamente inscritos en el Registro de Contratos de la Oficina del Contralor. Ni hay controversia a que, conforme al hecho expositivo SEGUNDO del referido contrato, **el propósito de la contratación de servicios profesionales fue** *"para el análisis de Cuentas y Gestiones de Cobro sobre contribuciones sobre la propiedad mueble e inmueble del* **Municipio Autónomo de Guayama***, según propuesta."*

Además, de las determinaciones de hechos materiales número **8**, **9** y **10** no controvertidas se desprende —conforme al *Contrato de Servicios Profesionales*— que el Municipio de Guayama haría disponible a JM todos los datos e información que estuvieran bajo su jurisdicción y que fueren necesario para la realización del proyecto. Entre los datos a proveer por el Municipio estarían los siguientes:

- Listado de cuentas por cobrar de contribuciones sobre la propiedad muebles e inmueble por año fiscal.
- Cualquiera otra requerida para el desarrollo del proyecto.

Nótese, que con dichos datos, *"se realizaría una evaluación de los posibles deudores por contribuciones sobre la propiedad y/o cualquiera otro concepto* **solicitado por el Municipio"**, lo cual *"permitiría una visión clara de la cartera de cuentas por cobrar y las expectativas de recaudo."* Es decir, la información que obrase en el CRIM sería requerida por el Municipio de Guayama y brindada a JM para evaluar a los posibles deudores en dicho municipio y eventualmente realizar la gestión de cobro.

Más importante, no obra en el citado *Contrato de Servicios Profesionales*, ni en las determinaciones de hechos incontrovertidas realizadas por el TPI y avaladas por este Tribunal, que el señor Márquez Pérez ofreciera al pasado alcalde, como al actual, o algún

funcionario del MA-Guayama información que haya obtenido mientras fungió como como alcalde del Municipio de Maunabo o miembro de la Junta de Alcaldes del CRIM para obtener o mantener el referido contrato.

No menos importante, tampoco obra en el expediente ni en las determinaciones de hecho incontrovertidas que, como alcalde del Municipio de Maunabo o miembro de la Junta de Alcaldes del CRIM, el señor Márquez Pérez se haya beneficiado de manera alguna con datos privilegiados o confidenciales que obtuvo en el desempeño de esas funciones públicas.

En fin, el *Contrato de Servicios Profesionales* firmado entre las partes no requiere la comparecencia ante el CRIM de JM ni del señor Márquez Pérez. Tampoco ofrece información de clase alguna obtenida como alcalde del Municipio de Maunabo o miembro de la Junta de Alcaldes del CRIM.

**Tercero**, conforme a lo antes expuesto y la controversia que nos ocupa, examinemos el alcance del citado Artículo 4.6 (a) y (b) de la Ley Núm. 1-2012, que dispone lo siguiente:

> **(a) Un ex servidor público no puede ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar en cualquier capacidad, directa o indirectamente**, a una persona privada, negocio o entidad pública, sobre aquellas **acciones oficiales** o **asuntos** en los que intervino mientras trabajó como servidor público.

> **(b) Un ex servidor público no puede, durante los dos (2) años siguientes a la fecha de terminación de su empleo gubernamental**, ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública**, ante la agencia para la que laboró**.

Nótese, que la condición predominante para la prohibición del Artículo 4.6 (a), es que el ex funcionario público **ofrezca información, intervenga, coopere, asesorare en forma alguna o represente en cualquier capacidad, directa o indirectamente**, a una persona privada, negocio o entidad pública, sobre aquellas

**acciones oficiales** o **asuntos** en los que intervino mientras trabajó como servidor público. Por su parte, y más específico, el Artículo 4.6 (b), prohíbe que el ex funcionario, entre otras, represente (directa o indirecta) a entidad alguna **ante la agencia para la que laboró**.

Como indicamos antes, si bien es cierto que el señor Márquez Pérez fungió como miembro de la Junta de Gobierno del CRIM (incluso presidio la Junta), no es menos cierto —y reiteramos— que el *Contrato de Servicios Profesionales* suscrito entre el MA-Guayama y JM no está —ni remotamente— dependiendo de información de clase alguna que el señor Márquez Pérez haya obtenido como alcalde del Municipio de Maunabo y/o miembro de la Junta de Alcaldes del CRIM. Tampoco hay evidencia en el récord ni se desprende de las determinaciones de hechos incontrovertidas que el señor Márquez Pérez haya ofrecido información, intervenido, cooperado, asesorado en forma alguna o representado en cualquier capacidad, directa o indirectamente al MA-Guayama **sobre** acciones oficiales o asuntos en los que intervino mientras fungió como alcalde del Municipio de Maunabo o miembro de la Junta de Alcaldes del CRIM. Destáquese además, que los asuntos que la Junta de Gobierno del CRIM se atienden colegiadamente y su reglamentación va dirigida a todos los municipios de Puerto Rico, agencias públicas, instituciones financieras y cooperativas de ahorro y crédito. Es decir, sus actuaciones están dirigidas a establecer la política pública, administrativa y operacional del CRIM; no a resolver controversias de partes en particular. Añádase también, que el *Contrato de Servicios Profesionales* establece que es el Municipio quien proveerá toda la documentación necesaria para que JM evalúe e identifique los posibles deudores de contribuciones sobre la propiedad mueble o inmueble. Cabe aclarar que nada impide que el señor Márquez Pérez pueda acceder información del portal público del CRIM https://portal.crim360.com/home/login.

Por lo tanto, es plausible concluir que la prohibición del referido Artículo 4.6 (a) y (b) de la Ley Núm. 107-2020, no ha sido infringida por el señor Márquez Pérez, JM, ni el MA-Guayama al pactar y ejecutar el *Contrato de Servicios Profesionales*. Reiteramos que no hay evidencia alguna en el expediente ni en las determinaciones de hechos incontrovertidas que razonablemente nos mueva a resolver lo contrario.

**Cuarto**, de las determinaciones de hechos incontrovertidas número **11**, **12**, **13**, **14** y **15** antes esbozadas, se desprende que el MA-Guayama se obligó a pagar a JM por sus servicios en una forma compuesta, Sección III, de Honorarios del contrato:

a. La porción correspondiente a los honorarios por servicios de planificación, evaluación y consultoría se acordó una cantidad fija de $8,400.00, a razón de 120 horas a $70.00, luego que los servicios se hubiesen realizado y durante el periodo comprendido por este contrato, Sección III, Dos.
b. Los honorarios relacionados con las gestiones de cobro se pagarían de forma contingente a razón de 25% de todos los recaudos obtenidos de las gestiones individuales, Sección III, Dos.

Además, los honorarios pactados por el cobro fueron contingentes y es a esa cuantía que va dirigida la reclamación del demandante ya que la parte demandada se obligó, conforme al referido contrato, SECCION III, TRES, a pagar conforme a lo siguiente:*"...ordenar los pagos correspondientes a los servicios prestados con cargos a la partida número 01-03-04-94.11. Servicios Profesionales, ID-FY2022, luego de que los servicios prestados hayan sido certificados."* Nótese que los honorarios pactados van acorde con lo establecido en el citado inciso (r) del Artículo 1.010 de la Ley Núm. 107-2020.

A tono con lo pactado, JM le reclamó al Municipio de Guayama por las facturas de servicios brindados en las siguientes fechas:

a. Factura 2021 – 01, 12/17/2021, correspondiente a la suma de **$36,640.41**.

b. Factura 2022-110, 1/12/2022, correspondiente a la suma de **$54,180.44**.

c. Factura 2022-116, 2/14/2022, correspondiente a la suma de **$153,743.19**.

d. Factura 2022-120, 3/07/2022, correspondiente a la suma de **$118,207.12**.

e. Factura 2022-125, 4/07/2022, correspondiente a la suma de **$12,685.19**.

f. Factura 2022-129, 5/24/2022, correspondiente a la suma de **$11,597.40**.

Total: **$387,053.75**

Tampoco hay controversia en que, el MA-Guayama en ningún momento presentó queja alguna en cuanto a los servicios prestados por JM, por lo cual, admite que se benefició económicamente de los servicios prestados.

**Quinto**, conforme a las determinaciones de hechos incontrovertidas número **16**, **17**, **18**, **19**, **20** y **21** antes expresadas, el **20 de julio de 2022** el MA-Guayama solicitó una consulta a la OEG referente a —si a la luz de las disposiciones de la Ley de Ética Gubernamental, *supra*— **podía pagarle a JM por los servicios prestados**. Por lo que el **31 de agosto de 2022**, en la consulta **CE-23-077**,[107] la OEG en lo pertinente, le expresó al Municipio:

> El **29 de julio de 2022**, la Oficina de Ética Gubernamental de Puerto Rico recibió su comunicación con fecha de 20 de julio de 2022. En síntesis, nos informa que el 27 de octubre de 2021, el Municipio Autónomo de Guayama (Municipio) otorgó un contrato por servicios profesionales a JM Advisory Group, LLC (JM). Al contrato compareció en representación del Municipio el Sr. Eduardo E. Cintrón Suárez, su exalcalde, y el Sr. Jorge L. Márquez Pérez, administrador de JM. El señor Márquez Pérez fue alcalde del Municipio de Maunabo hasta el 31 de diciembre de 2020, y, en tal capacidad era miembro de la Junta de Alcaldes del Centro de Recaudaciones de Ingresos Municipales (CRIM). Su consulta obedece a que JM le está reclamando al Municipio el pago de unos servicios prestados como parte de la indicada contratación.
>
> Explica que mediante la mencionada contratación el señor Márquez Pérez, a través de JM, prestó al Municipio servicios de cobro de deudas por concepto de sobre la propiedad mueble e inmueble de los residentes del Ayuntamiento. Añade que por las deudas cobradas este recibía una contingencia que fluctuaba entre el diez y el veinticinco por ciento, dependiendo del alcance de la deuda.
>
> Expone que mientras que el Municipio estaba considerando las facturas presentadas por el señor Márquez Pérez, en representación de la corporación, advino en conocimiento de la opinión emitida por nuestra Oficina mediante la **CE-22-025**, **de 19 de julio de 2021**.
>
> Dicha opinión surge como consecuencia de una comunicación que nos remitiera el señor Márquez Pérez en la que nos consultó si

---

[107] Apéndice VIII de la *Apelación*, 180-181.

> se podía asociar con la firma RS Consulting Services, Inc., para prestar a los municipios servicios de cobro de deudas por concepto de contribuciones de la propiedad mueble e inmueble.
>
> En la **CE-22-025** expresamos que el señor Márquez Pérez **no podía asociarse o contratar con RS Consulting Services, Inc.** durante el año siguiente a la fecha en la que cesó de funciones como alcalde. **Asimismo**, puntualizamos que **no podía comparecer ante el CRIM o ante cualquier entidad del Municipio de Maunabo** a ofrecer información, intervenir, cooperar, asesorar en forma alguna o representar, directa o indirectamente, a una persona privada, negocio o entidad pública durante los dos años siguientes a la culminación de su incumbencia como alcalde.
>
> En consideración a que los servicios del señor Márquez Pérez pretendía prestar a través de RS Consulting Services, Inc. a los municipios de Puerto Rico son similares a los que prestó al Ayuntamiento mediante el contrato de 27 de octubre de 2021, **nos consulta si a la luz de las disposiciones de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, el Municipio puede pagarle a este por los servicios prestados**.
>
> Agradecemos su interés en que nuestra Oficina le asesore con respecto al referido asunto. No obstante, **la OEG no tiene jurisdicción sobre el mismo.** Le sugerimos **consulte con la Oficina del Contralor de Puerto Rico (OCPR)**. Fíjese, que una de las responsabilidades ministeriales de la OCPR estriba en asegurarse que todos los desembolsos del Gobierno de Puerto Rico, sus agencias, organismos y municipios, se realicen de acuerdo con la ley.[108]

Nótese, que a la pregunta formulada por el MA-Guayama, la OEG se declaró sin jurisdicción y le refirió a la Oficina del Contralor de Puerto Rico (OCPR). No obstante, el Municipio no realizó el pago de lo adeudado, a pesar de las gestiones extrajudiciales que hizo JM. Por lo tanto, al presentarse la demanda de epígrafe, el Municipio de Guayama no había pagado la suma requerida de **$387,053.75** bajo la alegación de que JM estaba impedido de contratar con el ayuntamiento de Guayama, según su interpretación de las opiniones emitidas por la OEG a las referidas consultas **CE-22-025** y **CE-23-077**.

A todas luces la cantidad el *Contrato de Servicios Profesionales* firmado entre las partes es uno válido y la cantidad de **$387,053.75** que reclama JM por los servicios prestados al MA-Guayama es una líquida y exigible.

---

[108] Apéndice VIII de la *Apelación*, págs. 180-181. Énfasis nuestro.

En conclusión, erró el TPI al dictar la Sentencia Sumaria apelada y declarar *No Ha Lugar* la *Moción en Solicitud de Sentencia Sumaria* presentada por JM. De igual modo, incidió al declarar Con Lugar la *Oposición y Solicitud de Sentencia Sumaria* del MA-Guayama.

**-IV-**

Por los fundamentos antes expuestos, revocamos la *Sentencia Sumaria* apelada. Razón por la cual, declaramos **Ha Lugar** a la *Moción en Solicitud de Sentencia Sumaria* presentada por JM; así, concedemos la demanda en cobro de dinero incoada por JM en contra del MA-Guayama. Por consiguiente, declaramos **Sin Lugar** la *Oposición y Solicitud de Sentencia Sumaria* del Municipio.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones